DiFRANCO v PICKARD

BURK v WARREN

PAUPORE v ROUSE

KUCERA v NORTON

ROUTLEY v DAULT

Docket Nos. 74692, 74867, 75263, 75299, 75811. Argued January 16, 1986 (Calendar Nos. 6-10). Decided December 23, 1986. Rehearings denied in *Burk, Kucera,* and *Routley,* 428 Mich 1206.

Thomas DiFranco brought an action in the Macomb Circuit Court against Maurice H. Pickard, seeking noneconomic damages and claiming serious impairment of body function with respect to soft tissue injuries to his back as a result of an automobile accident when his vehicle was struck in the rear by the defendant. The court, Kenneth N. Sanborn, J., removed the case to the 39th District Court. Prior to trial, the defendant admitted negligence. The court, William B. Ward, J., entered judgment on a jury verdict that the defendant's negligence was the proximate cause of the plaintiff's injuries, but that the plaintiff had not suffered a serious impairment of body function. The Macomb Circuit Court, Ollie B. Bivins, J., affirmed. The Court of Appeals, Allen, P.J., and T. M. Burns and Martin, JJ., denied the plaintiff leave to appeal (Docket No. 76272). The plaintiff appeals.

Douglas Burk brought an action in the Ingham Circuit Court against David Warren, seeking damages for injuries suffered when he was hit by the defendant's truck as he was riding his motorcycle. The court, Thomas L. Brown, J., entered judgment on a jury verdict that the defendant was negligent and had proximately caused the plaintiff's injuries, but that the plaintiff's injuries did not cause a serious impairment of body function. The Court of Appeals, Deneweth and Beasley, JJ. (T. M. Burns, P.J., concurring), reversed, concluding that the

REFERENCES

Am Jur 2d, Automobile Insurance §§ 340 *et seq.,* 349, 357 *et seq.*

Am Jur 2d, Insurance § 2031 *et seq.*

See the annotations in the Index to Annotations under No-Fault Insurance.

plaintiff had sustained a serious impairment of body function as a matter of law (Docket Nos. 47885, 48909). The Supreme Court, in lieu of granting leave to appeal, remanded the case to the circuit court with instructions to proceed in light of *Cassidy v McGovern*, 415 Mich 483 (1982). On remand, the circuit court, Thomas L. Brown, J., found as a matter of law that the plaintiff had suffered a serious impairment of body function. After remand, the Court of Appeals, V. J. BRENNAN, P.J., and R. B. BURNS and COLEMAN, JJ., reversed in an opinion per curiam, holding that the plaintiff's injury was objectively manifested, but that the plaintiff had not suffered serious impairment of body function as a matter of law (Docket No. 74636). The plaintiff appeals.

Roderick B. Paupore brought an action in the Grand Traverse Circuit Court against Betty A. Rouse and Yvonne Johnson, personal representative of the estate of Gerald D. Rouse, deceased, alleging that injuries sustained while a passenger in a car owned by Betty Rouse and driven by her son, Gerald, resulted in a serious impairment of body function and permanent serious disfigurement. The court, William R. Brown, J., entered judgment on a jury verdict that Gerald Rouse had been negligent and that his negligence had proximately caused the plaintiff's injuries, but concluded that the plaintiff had not suffered a serious impairment of body function or permanent serious disfigurement. The Court of Appeals, R. M. MAHER, P.J., and BRONSON and McDONALD, JJ., affirmed in an unpublished opinion per curiam, finding that there was a material factual dispute as to the nature and extent of plaintiff's injuries which precluded a directed verdict on the issue of serious impairment (Docket No. 71705). The plaintiff appeals.

Frederick Kucera brought an action in the Grand Traverse Circuit Court against Mark R. Norton, alleging serious impairment of body function with respect to injuries sustained when defendant struck plaintiff's truck from the rear. The court, Charles M. Forster, J., granted judgment for the defendant notwithstanding the jury's verdict for the plaintiff, concluding as a matter of law that the plaintiff had not sustained a serious impairment of body function. The Court of Appeals, J. H. GILLIS, P.J., and M. J. KELLY and MULLEN, JJ., affirmed in an opinion per curiam (Docket No. 73192). The plaintiff appeals.

Harley Routley brought an action in the Muskegon Circuit Court against Gregory R. Dault, seeking damages for injuries sustained when his truck struck the defendant's car from the rear, alleging that the defendant was negligent, that the negligence was the cause of the plaintiff suffering a hernia, and that the

hernia was a serious impairment of body function. The court, Ronald H. Pannucci, J., granted summary judgment for the defendant, holding that a hernia is not a serious impairment of body function. The Court of Appeals, R. M. MAHER and REILLY, JJ. (M. J. KELLY, P.J., dissenting), affirmed in an opinion per curiam (Docket No. 70293). The plaintiff appeals.

In an opinion by Justice CAVANAGH, joined by Justices BRICK-LEY, BOYLE, and ARCHER, the Supreme Court held:

The question whether a plaintiff suffered a serious impairment of body function must be submitted to the jury whenever the evidence would cause reasonable minds to differ as to the answer, even where there is no material factual dispute as to the nature and extent of the plaintiff's injuries. In deciding motions for, and reviewing orders granting or denying, summary disposition, directed verdict, and judgment notwithstanding the verdict, the trial court must view the evidence in the light most favorable to the nonmoving party and determine whether a material factual dispute exists as to the nature and extent of the plaintiff's injuries, and whether reasonable minds could differ regarding whether the plaintiff had sustained a serious impairment of body function. Where the threshold issue is properly submitted to the trier of fact, its findings generally should not be disturbed.

Recovery of noneconomic damages was not intended to be limited to catastrophic injuries. The "serious impairment of body function" threshold is a significant, but not extraordinarily high, obstacle to recovery. Impairment need not be of the entire body function or of an important body function. The threshold requires inquiry into what body function, if any, was impaired because of injuries sustained in a motor vehicle accident, and whether the impairment was serious. The focus of the inquiry is not on the injuries, but on how the injuries affected a particular body function, generally requiring medical testimony to establish the existence, extent, and permanency of the impairment.

In determining whether an impairment was serious, the extent of the impairment, the particular body function impaired, the length of time of the impairment, the treatment required to correct the impairment, and any other relevant factors should be considered. An impairment need not be permanent to be serious. Nor is it necessary that an injury be seen or felt to permit recovery. Rather, the noneconomic loss must be shown to have arisen from a medically identifiable injury which seriously impaired a body function. When the threshold question is submitted to the jury, the jury should be

instructed as to the two-fold nature of the inquiry and as to the factors to be considered in determining seriousness.

The holding is to be applied to currently pending appeals in which an issue concerning the proper interpretation of the statutory phrase "serious impairment of body function" has been raised, to trials in which a jury is instructed after the date of this decision, and to cases in which summary disposition is entered after the date of this decision.

*DiFranco, Paupore,* and *Burk,* affirmed.

*Kucera* and *Routley,* reversed and remanded.

Chief Justice WILLIAMS, joined by Justice RILEY, concurring in part and dissenting in part, stated that where there is no factual dispute regarding the extent of a plaintiff's injuries the trial court is to decide as a matter of statutory construction whether the plaintiff has suffered a serious impairment of body function. Where there is a factual dispute which straddles the line demarcating those injuries which constitute serious impairment of body function, and those which do not, the factual dispute is to be submitted to the jury, which should be instructed that, if it finds the facts to be as the plaintiff claims, it must also find a serious impairment of body function.

Justice LEVIN concurred with Chief Justice WILLIAMS for the reasons stated in part 1 of his opinion.

137 Mich App 715; 359 NW2d 541 (1984) affirmed.

140 Mich App 156; 363 NW2d 11 (1984) reversed.

140 Mich App 190; 363 NW2d 450 (1984) reversed.

1. INSURANCE — NO-FAULT — NONECONOMIC LOSS — SERIOUS IMPAIRMENT OF BODY FUNCTION.

The question whether a plaintiff suffered a serious impairment of body function must be submitted to the jury whenever the evidence would cause reasonable minds to differ as to the answer, even where there is no material factual dispute as to the nature and extent of the plaintiff's injuries (MCL 500.3135; MSA 24.13135).

2. INSURANCE — NO-FAULT — NONECONOMIC LOSS — SERIOUS IMPAIRMENT OF BODY FUNCTION — SUMMARY DISPOSITION.

In an action in which the plaintiff claims serious impairment of body function resulting from a motor vehicle accident, a trial court, in deciding motions for, and reviewing orders granting or denying, summary disposition, directed verdict, and judgment notwithstanding the verdict, must view the evidence in the light most favorable to the nonmoving party and determine whether a material factual dispute exists as to the nature and

extent of the plaintiff's injuries, and whether reasonable minds could differ regarding whether the plaintiff had sustained a serious impairment of body function; where the threshold issue was properly submitted to the trier of fact, its findings generally should not be disturbed (MCL 500.3135; MSA 24.13135).

3. INSURANCE — NO-FAULT — NONECONOMIC LOSS — SERIOUS IMPAIRMENT OF BODY FUNCTION.

A serious impairment of body function under the no-fault act need not be an impairment of the entire body function or of an important body function; the threshold requires inquiry into what body function, if any, was impaired because of injuries sustained in a motor vehicle accident, and whether the impairment was serious; the focus of the inquiry is not on the injuries, but on how the injuries affected a particular body function (MCL 500.3135; MSA 24.13135).

4. INSURANCE — NO-FAULT — NONECONOMIC LOSS — SERIOUS IMPAIRMENT OF BODY FUNCTION.

In an action in which the plaintiff claims serious impairment of body function resulting from a motor vehicle accident, the trial court, in determining whether the impairment was serious, should consider the extent of the impairment, the particular body function impaired, the length of time of the impairment, the treatment required to correct the impairment, and any other relevant factors (MCL 500.3135; MSA 24.13135).

5. INSURANCE — NO-FAULT — NONECONOMIC LOSS — SERIOUS IMPAIRMENT OF BODY FUNCTION.

An impairment of body function need not be permanent to be serious; nor is it necessary that an injury be seen or felt to permit recovery under the no-fault act; rather, the noneconomic loss must be shown to have arisen from a medically identifiable injury which seriously impaired a body function (MCL 500.3135; MSA 24.13135).

*Robert C. Vandenbroucke* for plaintiff DiFranco.

*Philip C. Dean* for plaintiff Burk.

*Clancey & Price, P.C.* (by *Philip A. Clancey*), for plaintiffs Paupore and Kucera.

*Law Offices of Norman C. Halbower, P.C.* (by *James K. Oslund* and *Norman C. Halbower*), for plaintiff Routley.

*Lee E. Halsey* for defendant Pickard.

*Fraser, Trebilcock, Davis & Foster, P.C.* (by *C. Mark Hoover* and *Mark A. Bush*), for defendant Warren.

*Bensinger, Combs & Cotant, P.C.* (by *Richard G. Bensinger*), for defendants Rouse and Johnson and (by *Richard G. Bensinger* and *Michael Combs*) for defendant Dault.

*Read & Griffin* (by *Douglas J. Read*); (*Gromek, Bendure & Thomas*, by *Carl L. Gromek* and *Nancy L. Bosh*, of counsel) for defendant Norton.

Amici Curiae:

*Eggenberger, Eggenberger, McKinney & Weber, P.C.* (by *William D. Eggenberger*), for State Farm Mutual Automobile Insurance Company.

*Anderson, Hay & Wonch, P.C.* (by *Thomas H. Hay*), for Michigan Trial Lawyers Association.

CAVANAGH, J. Section 3135(1) of Michigan's no-fault automobile insurance law[1] permits a person injured in a motor vehicle accident to recover damages for noneconomic loss from a negligent owner or operator of a motor vehicle only if the person suffered death, serious impairment of body function, or permanent serious disfigurement:

> A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement. [MCL 500.3135(1); MSA 24.13135(1).]

[1] MCL 500.3101; MSA 24.13101.

In each of these five cases, the plaintiff attempted to recover noneconomic damages by alleging that he had suffered a serious impairment of body function. Applying the rules articulated in *Cassidy v McGovern,* 415 Mich 483; 330 NW2d 22 (1982), the Court of Appeals held in each case that the plaintiff had not incurred sufficiently serious injuries to meet the threshold requirements of § 3135(1).

Determining whether a person sustained a serious impairment of body function is a multifaceted problem. Since *Cassidy* was decided, the Court of Appeals has published approximately forty opinions on the subject. Some of these opinions have reached conflicting legal and factual conclusions. Since § 3135(1) limits noneconomic damages which are ordinarily recoverable in a tort cause of action, we must determine the parameters of those limitations with reference to the Legislature's intent, as expressed in the statutory language and legislative history. The conclusions we reach must then be articulated in a workable set of rules for the bench and bar. With these goals in mind, we have reviewed § 3135(1), *Cassidy,* and the cases interpreting them, and hold as follows:

1) The question whether the plaintiff suffered a serious impairment of body function must be submitted to the trier of fact whenever the evidence would cause reasonable minds to differ as to the answer. This is true even where there is no material factual dispute as to the nature and extent of the plaintiff's injuries.

2) In deciding motions for, and reviewing orders granting or denying, summary disposition, directed verdict and judgment notwithstanding the verdict, the court must view the evidence in the light most favorable to the nonmoving party and determine:

a) whether a material factual dispute exists as

to the nature and extent of the plaintiff's injuries, and

b) whether reasonable minds could differ regarding whether the plaintiff had sustained a serious impairment of body function.

If the threshold issue was properly submitted to the trier of fact, its findings generally should not be disturbed.

3) The Legislature did not intend to limit recovery of noneconomic damages to the catastrophically injured. The "serious impairment of body function" threshold is a significant, but not extraordinarily high, obstacle to recovering such damages.

4) The impairment need not be of the entire body function or of an important body function. Section 3135(1) bars recovery of noneconomic damages to those persons who suffered minor injuries, or injuries which did not seriously impair the ability of the body, in whole or in part, to function.

5) The "general ability to live a normal life" test will no longer be used to determine whether the plaintiff suffered a serious impairment of body function.

6) The "serious impairment of body function" threshold contains two inquiries:

a) What body function, if any, was impaired because of injuries sustained in a motor vehicle accident?

b) Was the impairment of body function serious? The focus of these inquiries is not on the injuries themselves, but on how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent, and permanency of the impairment.

7) In determining whether the impairment was serious, several factors should be considered: the

extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious.

8) When the threshold question is submitted to the jury, it should be instructed as to the two-fold nature of the "serious impairment of body function" threshold, and the factors to be considered in determining seriousness.

9) Section 3135(1) and *Cassidy* require the plaintiff to prove that his noneconomic losses arose out of a medically identifiable injury which seriously impaired a body function. The interpretation of *Cassidy's* "objectively manifested injury" requirement adopted in *Williams v Payne,* 131 Mich App 403; 346 NW2d 564 (1984), is rejected.

10) To the extent that the above holdings are new or inconsistent with *Cassidy,* our decision applies to the five cases before us as well as to: (1) currently pending appeals in which an issue concerning the proper interpretation of the statutory phrase "serious impairment of body function" has been raised, (2) trials in which a jury is instructed after the date of this decision, and (3) cases in which summary disposition is entered after the date of this decision.

### I. HISTORY OF § 3135(1)

Approximately one-quarter of the states have enacted no-fault automobile insurance laws.[2] The

---

[2] Colo Rev Stat 10-4-701 *et seq.;* Conn Gen Stat Ann, § 38-319 *et seq.;* Del Code Ann, tit 21, § 2118; DC Code Ann, § 35-2101 *et seq.;* Fla Stat Ann, § 627.730 *et seq.;* Ga Code Ann, § 33-34-1 *et seq.;* Hawaii Rev Stat, § 294-1 *et seq.;* Ill Rev Stat, ch 73, ¶ 1065.150 *et seq.,* repealed by 1975 PA 78-1297; Kan Stat Ann 40-3101 *et seq.;* Ky Rev Stat 304.39-010 *et seq.;* Md Ann Code, art 48A, § 538 *et seq.;* Mass Ann Laws, ch 90, §§ 34A,D,M,N,O; ch 231, § 6D; MCL 500.3101 *et seq.,*

basic feature of these acts is compulsory motor
vehicle insurance, which permits the insured to
recover benefits directly from his insurer, regard-
less of fault, for certain economic losses sustained
as a result of a motor vehicle accident.[3] In return,
the injured person's common-law right to recover
damages from the negligent owner or operator of
the motor vehicle in a tort action is limited.[4] No-
fault laws were designed to remedy the shortcom-
ings of the traditional tort recovery system—over-
compensation of minor injuries, undercompensa-
tion of serious injuries, long payment delays, over-
burdened court systems, and discrimination
against those with low income and little education.
*Cassidy,* 415 Mich 498-499; *Shavers v Attorney
General,* 402 Mich 554, 578-579; 267 NW2d 72
(1978), cert den sub nom *Allstate Ins Co v Kelley,*
442 US 934 (1979).

One of the most controversial aspects of these
laws is the limitations often placed on the injured
person's right to recover damages for pain and
suffering, mental anguish, inconvenience, and loss
of consortium from the negligent owner or opera-

MSA 24.13101 *et seq.;* Minn Stat Ann, § 65B.41 *et seq.;* Nev Rev Stat
698.310 *et seq.,* repealed by 1979 Nev Stat, ch 1519; NJ Stat Ann
39:6A-1 *et seq.;* NY Ins Law, § 5101 *et seq.* (McKinney); ND Cent Code
26-41-01 *et seq.;* Or Rev Stat 743.800 *et seq.;* 75 Pa Cons Stat Ann,
§ 1701 *et seq.* (Purdon); SC Code, § 56-11-10 *et seq.;* Utah Code Ann
31A-22-306 *et seq.* Arkansas, South Dakota, Texas, and Virginia have
enacted no-fault laws, but automobile insurance is not compulsory.

[3] In Michigan, an injured person may obtain personal protection
insurance benefits for all allowable medical expenses, and wage loss
for up to three years, within specified limits. MCL 500.3107; MSA
24.13107. Benefits for survivor's loss are available for up to three
years, within specified limits. MCL 500.3108; MSA 24.13108. Property
protection benefits are also available. See MCL 500.3121; MSA
24.13121.

[4] Under MCL 500.3135; MSA 24.13135, tort liability is abolished
except as to losses intentionally caused, damages for allowable expen-
ses, work loss and survivor's loss not provided under the no-fault act,
and damages for noneconomic loss if the injured person suffered a
threshold injury.

tor. Some states place no restrictions on the ability to recover damages for these noneconomic losses.[5] The remaining states, including Michigan, permit recovery only where the injuries sustained are sufficiently serious.[6]

The precursor of Michigan's no-fault act, SB 782, was introduced on June 2, 1971.[7] Section 35 would have abolished all tort liability for bodily injury and property damage, regardless of the injuries sustained, except under very limited circumstances.[8] A substitute bill was recommended by the Senate Committee on Commerce on May 30, 1972,[9] and adopted by the Senate. The new tort liability provision was substantially different than that proposed in the original bill.

Senator Faxon proposed several amendments to

[5] In Delaware, Maryland, Oregon, Pennsylvania, and South Carolina, where no-fault insurance is compulsory, the right to sue for noneconomic loss is not limited. No-fault states which do not require insurance coverage also place no restrictions on the right to sue for these losses—Arkansas, South Dakota, Texas, and Virginia.

[6] Once a plaintiff proves that he has suffered a serious impairment of body function, he can recover all of his noneconomic losses, even for periods when the impairment is no longer serious. *Byer v Smith*, 419 Mich 541; 357 NW2d 644 (1984).

[7] 1971 Journal of the Senate 1000.

[8] Section 35 provided:

When accidental bodily injury or accidental damage to tangible property arises out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, an owner, registrant, operator or occupant of a motor vehicle involved in the accident and persons or organizations legally responsible for his acts or omissions are exempt from tort liability for the bodily injury or property damage. However, an owner, registrant, operator or occupant shall not be so exempt if he is excluded under section 13 from personal protection insurance benefits for accidental bodily injury arising from the same motor vehicle accident. This exemption applies where the law of this state controls in determining tort liability.

Section 13 excluded any person who had stolen, or not insured, the motor vehicle involved in the accident. Nonresidents occupying out-of-state uninsured vehicles were also excluded.

[9] 1972 Journal of the Senate 1275.

the provision limiting recovery of noneconomic damages to those who sustained certain injuries. He proposed, but later withdrew, an amendment which would have inserted after "death" the following threshold injuries:

> permanent serious impairment of body function, permanent serious disfigurement or medical bills in excess of $5000.00.[10]

Senator Faxon proposed two other amendments to the threshold requirements:

> permanent, major, or extensive disability of body function, permanent loss of mental competency, or medical bills in excess of $5000.00;

> permanent serious disfigurement or an injury which is so extraordinarily severe as to render the legal remedy therefor under this statute inadequate.

Neither amendment was adopted.[11]

The Senate substitute bill was sent to the House on June 8, 1972.[12] The House Committee on Insurance proposed its own substitute bill, which was adopted by the House on September 26, 1972.[13] Like the substitute Senate bill, the House bill retained tort liability for noneconomic loss if the injured person died, or sustained a serious impairment of body function or permanent serious disfigurement.[14]

---

[10] *Id.,* pp 1380, 1390.

[11] *Id.,* p 1391.

[12] 1972 Journal of the House 2157.

[13] *Id.,* p 2807.

[14] Section 3115 of the House substitute bill provided:

A person remains subject to tort liability for noneconomic detriment caused by his ownership, maintenance or use of a

Several representatives protested the passage of the House substitute bill, particularly the limitations placed upon the recovery of noneconomic damages. Representative Kelsey stated that "[a] limit of $10,000 before tort action could result would have been much more satisfactory . . . ." Representative Clark criticized the entire bill partly because "[t]he benefit will go to the wrong doer rather than the safe driver whose present right to recover for pain and suffering will be almost eliminated."[15]

Representative Smeekens presented a lengthy article from the Detroit News describing the lobbyists' "tug-of-war." The article included the following pertinent observations:

> [The bill] leaves the door open for lawyers to represent clients involved in accidents which result in death, permanent disability, serious disfigurement, losses in excess of benefits, or serious impairment of body functions.
> The impairment clause was the key to how the bill would turn out.
> *The insurance company lobbyists wanted it to read serious impairment of "significant body functions." The lawyers opposed the word "significant" being included in the law.*
> The committee finally reported the no-fault bill to the floor by a vote of 10-0, *but only after the insurance lobby lost out in its efforts to save the key clause.*
>
> \* \* \*
>
> *The lawyers*—many of whom make considerable incomes suing on this basis—*didn't want the word*

motor vehicle only if the injured person dies or sustains serious impairment of body function or permanent serious disfigurement. [*Id.,* p 4122.]

[15] *Id.,* pp 2832-2833.

*"significant" in the law because it would make it more difficult to bring suit.* [Emphasis added.][16]

The Senate did not concur in the House substitute bill.[17] On October 5, 1972, a Senate conference committee recommended that the prior Senate substitute bill be adopted. Representative Crampton objected to the recommendation because "[t]his bill makes it possible—probable—that innocent law abiding drivers will be clobbered by some careless or drunken driver plowing through a stop sign or stop light—and live in pain for the rest of their life with no chance to recover any damages."[18] Nevertheless, the Senate and House adopted the recommendation.[19] The no-fault act was signed on November 27, 1972, as 1972 PA 294,[20] and became effective on March 30, 1973.

In short, although a few opponents believed that § 3135(1) would eliminate most suits for noneconomic loss, the Legislature rejected proposals that would have made it much more difficult to sue for noneconomic damages. Specifically, it rejected a $5000 medical bill threshold, a requirement that the impairment of body function be permanent, major, or extensive, and a requirement that the body function impaired be a significant one. The Legislature thus did not intend to limit recovery only to catastrophically injured persons.

## II. THRESHOLD REQUIREMENTS IN OTHER STATES

An examination of other states' no-fault provisions which limit recovery of noneconomic dam-

---

[16] *Id.,* p 2831.

[17] *Id.,* p 2889; 1972 Journal of the Senate 1944.

[18] 1972 Journal of the House 2972.

[19] *Id.,* p 2971; 1972 Journal of the Senate 2005-2006, 2025.

[20] 1972 Journal of the Senate 2032.

ages reveals that Michigan has the most open-ended and broadly worded threshold requirements.

Section 5(a)(7) of the Uniform Motor Vehicle Accident Reparations Act permits recovery of damages for noneconomic detriment in excess of $5000,

> but only if the accident causes death, significant permanent injury, serious permanent disfigurement, or more than 6 months of complete inability of the injured person to work in an occupation. "Complete inability of an injured person to work in an occupation" means inability to perform, on even a part-time basis, even some of the duties required by his occupation or, if unemployed at the time of injury, by any occupation for which the injured person was qualified. [See 14 ULA 64.]

The commissioners' comments state that the threshold requirements were designed to preserve actions for noneconomic loss "only for persons who have suffered very serious injury." To discourage arguable claims with some settlement value, § 5(a)(7) requires a $5000 deduction from the amount awarded for noneconomic loss. *Id.,* pp 68-69. Unlike Michigan's no-fault act, the UMVARA limits recovery to permanently injured persons, and those who are completely unable to perform their job for at least six months.

Every state which limits recovery of noneconomic damages, except Michigan, has enacted monetary thresholds, on the basis of the amount of medical expenses reasonably incurred as a result of the motor vehicle accident.[21] Several states also specify injuries which can be the basis of a noneconomic loss action. Fractures are mentioned in

---

[21] The threshold amounts vary from $200, in the case of soft tissue injuries (NJ Stat Ann 39:6A-8[a]), to $5000 (DC Code Ann, § 35-2105[b][6]). Florida and New York have since repealed their monetary thresholds. For a critique of monetary thresholds, see 2 Farrell, Hartig & Koatz, eds, No-Fault and Uninsured Motorist Automobile Insurance, § 18.10(1), pp 18-9 to 18-12.

some statutes.[22] Kansas and Kentucky specifically require the fracture to be of a weight-bearing bone, or one which is compound, comminuted, displaced, or compressed. New Jersey does not permit recovery if the injured person sustained only soft tissue injuries and incurred less than $200 in medical expenses. "Soft tissue injury" is extensively defined to include sprains, strains, and tears to muscles, tendons, ligaments, and cartilage.[23] Five states list specific periods of disability, ranging from ten days (Georgia) to 180 days (District of Columbia). Like the UMVARA, these statutes usually define what constitutes a disability.[24]

Numerous states include loss or impairment of a body function as a threshold injury, but nearly all require the loss or impairment to be permanent.[25] Florida also requires that the body function impaired be an important one. As previously noted, the Michigan Legislature specifically rejected both requirements. Perhaps the threshold most akin to Michigan's "serious impairment of body function" threshold is that of New York—"significant limitation of use of a body function or system." However,

[22] Conn Gen Stat Ann, § 38-323(a); Ga Code Ann, §§ 33-34-2(13), 33-34-9(a); Kan Stat Ann 40-3117; Ky Rev Stat 304.39-060(2)(b); Mass Ann Laws, ch 231, § 6D; NY Ins Law, §§ 5102(d), 5104(a) (McKinney).

[23] NJ Stat Ann 39:6A-8(a) provides in part:

> Bodily injury confined solely to the soft tissue, for the purpose of this section, means injury in the form of sprains, strains, contusions, lacerations, bruises, hematomas, cuts, abrasions, scrapes, scratches, and tears confined to the muscles, tendons, ligaments, cartilages, nerves, fibers, veins, arteries and skin of the human body . . . .

[24] DC Code Ann, § 35-2105(b)(4); Ga Code Ann, § 33-34-2(13); Minn Stat Ann, § 65B.51(3)(b)(4); NY Ins Law, § 5102(d); ND Cent Code 26.1-41-01(21).

[25] Conn Gen Stat Ann, § 38-323(a)(5); Fla Stat Ann, § 627.737(2)(a); Ga Code Ann, § 33-34-2(13); Hawaii Rev Stat, § 294-6(1); Kan Stat Ann 40-3117; Ky Rev Stat 304.39-060(2)(b); NJ Stat Ann 39:6A-8(a), (b); NY Ins Law, § 5102(d).

the New York statute also contains several more specifically worded threshold injuries.[26]

Using these statutory provisions as guidelines, our Legislature could have easily clarified what types of injuries can be the basis of a suit for noneconomic damages. By choosing two rather amorphous thresholds, the Legislature apparently preferred that the parameters of § 3135(1) be developed through the judicial process. This has proven to be a difficult task for the judiciary.

### III. *CASSIDY v MCGOVERN*

*Cassidy* was this Court's first attempt to define what constitutes a "serious impairment of body function," what evidence is needed to meet this threshold, and when the issue should be submitted to the factfinder. The *Cassidy* Court concluded:

1) When there is no material factual dispute concerning the nature and extent of the plaintiff's injuries, the question whether the plaintiff sustained a serious impairment of body function must be decided as a matter of law by the trial court. 415 Mich 488, 502. In making this determination, the evidence must be viewed in the light most favorable to the nonmoving party. *Id.,* p 505.

2) The "serious impairment of body function" threshold is a significant obstacle to maintaining a tort action for noneconomic damages. It should be considered in conjunction with the other thresholds listed in § 3135(1), i.e., death and permanent serious disfigurement. *Id.,* p 503. An injury need not be permanent to be serious, although permanency is a relevant consideration. *Id.,* pp 505-506.

3) The impairment must be of an important body function, but not necessarily the entire body function. *Id.,* p 504.

---

[26] See NY Ins Law, § 5102(d).

4) To determine whether plaintiff sustained a serious impairment of body function, an objective standard should be used, which "looks to the effect of an injury on the person's general ability to live a normal life." *Id.,* p 505.

5) Recovery for noneconomic loss cannot be predicated solely on pain and suffering. Recovery must be based on "objectively manifested injuries" that affect the functioning of the body. *Id.*

These rules were applied to two cases where the nature and extent of the plaintiff's injuries were undisputed. In *Hermann v Haney,* the Court concluded, as a matter of law, that plaintiff's injuries were not sufficiently serious to meet the threshold. Plaintiff's bruises, which were not troublesome, cleared up within two months, while the bump on her head subsided within one month. Although she had missed a month of work due to back and neck pains, the pain diminished after that month, and presented no problems after two months. *Id.,* p 503.

In contrast, the injuries at issue in *Cassidy v McGovern* satisfied the threshold as a matter of law. Plaintiff had sustained two broken bones in the lower right leg, was hospitalized for eighteen days, and wore a cast for seven months. He suffered dizzy spells, which necessitated the use of a walker. He also suffered some residual pain one and one-half years after the accident. The Court concluded that the broken bones had impaired plaintiff's ability to walk, an important body function. The fact that plaintiff was a farmer who had to be on his feet for many hours was deemed an irrelevant consideration. In addition, plaintiff's claim was based on objectively manifested injuries (i.e., two broken bones), rather than general aches and pains. The Court further concluded that the impairment was serious, in light of the extensive

period of recuperation and minor residual problems. *Id.*, pp 504-505.

The *Cassidy* Court recognized that the phrase "serious impairment of body function" is not readily definable and its character would have to be developed on a case-by-case basis. As more cases were decided, the Court hoped that it would become clearer what types of injuries are sufficiently serious to meet this threshold. *Id.*, pp 502-503. Although approximately forty Court of Appeals opinions have since been published, the answer has not become much clearer.

In addition, *Cassidy* has spawned other problems. Court of Appeals panels have differed as to the standard for reviewing orders granting or denying summary disposition, directed verdict, and judgment notwithstanding the verdict. The "general ability to live a normal life" standard has proven to be as difficult to apply as the threshold it was designed to clarify. It is also unclear what types of injuries are "objectively manifested." Several panels have drawn a distinction between objectively manifested injuries and symptoms. This distinction often prevents persons who have sustained soft tissue injuries from recovering damages for noneconomic losses.

We therefore believe it is necessary to reexamine and clarify each of the major holdings of *Cassidy.*

### IV. DECIDING SERIOUS IMPAIRMENT AS A MATTER OF LAW

*Cassidy* held that when there is no material factual dispute as to the nature and extent of the plaintiff's injuries, the trial court must determine, as a matter of law, whether the plaintiff sustained a serious impairment of body function. Previously,

*Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 477-478; 208 NW2d 469 (1973), had held that the phrases "serious impairment of body function" and "permanent serious disfigurement" provide sufficient standards for legal interpretation and are generally questions of fact:

> This Court holds that such phrases are capable of legal interpretation and, indeed, that juries or judges sitting without juries frequently have and do interpret comparable phrases bearing upon various facets of the law. Such findings result from denominated fact questions and thus are within the exclusive province of the triers of fact. Only when interpretation approaches or breaches permissible limits does it become a question of law for the Court. Such questions must be approached on a case by case basis.

*Advisory Opinion* noted that triers of fact are routinely required to pass on equally difficult questions, e.g., reasonableness, proximate cause, gross negligence, and damages. *Id.,* pp 478-481.

The Court of Appeals consistently heeded *Advisory Opinion's* statement that the jury should usually decide whether the plaintiff had suffered a serious impairment of body function.[27] It also recognized that, in certain instances, the trial court should decide as a matter of law whether the plaintiff had, or had not, established a threshold injury. Such a decision could be made where "it can be said with certainty that no reasonable jury could view a plaintiff's impairment as serious." *Brooks v Reed,* 93 Mich App 166, 171; 286 NW2d 81 (1979), lv den 411 Mich 862 (1981). If the injury was "so minor" or of a "clearly superficial nature,"

[27] Only one Court of Appeals panel seriously questioned *Advisory Opinion.* See *McKendrick v Petrucci,* 71 Mich App 200, 209-212; 247 NW2d 349 (1976).

summary judgment should be granted to defendant. *Id.; Vitale v Danylak,* 74 Mich App 615, 620; 254 NW2d 593 (1977). Conversely, if the injury was so serious that no reasonable minds could differ as to whether the plaintiff had sustained a serious impairment of body function, the plaintiff should be granted summary judgment. *Watkins v City Cab Corp,* 97 Mich App 723, 726; 296 NW2d 162 (1980); *Cassidy v McGovern,* 86 Mich App 321, 325-326; 272 NW2d 644 (1978), rev'd 415 Mich 483 (1982). In making this determination, the evidence was viewed in the light most favorable to the nonmoving party. *Gallagher v Parshall,* 97 Mich App 654, 658-659; 296 NW2d 132 (1980); *Watkins, supra.*

The *Cassidy* Court dismissed the aforequoted language from *Advisory Opinion* because it was contained in a nonbinding advisory opinion, was made without discussion, and was based upon assumptions about trial procedure in trials that had not yet occurred. 415 Mich 497-498. The Court offered three reasons for holding that the serious impairment issue should generally be decided by the trial court. First, the phrase is not a commonly used term for which juries would have a clear sense of its intended meaning. Second, if the interpretation of the phrase must generally be submitted to the trier of fact, a trial would usually be necessary. This result would thwart the Legislature's intent to reduce litigation. Third, the Legislature could not have intended that the limitations it had created would vary according to the specific jury impaneled, or the part of the state in which the case was tried. Uniformity of application would be more attainable through statutory construction by appellate courts. *Id.,* pp 501-502. The *Cassidy* Court concluded:

The responsibility of effectuating the legislative will is primarily a matter of law for the court and not properly left to determination by a jury. . . . Therefore, we conclude that the meaning of "serious impairment of body function" is a matter to be determined by statutory construction. We hold that when there is no factual dispute regarding the nature and extent of a plaintiff's injuries, the question of serious impairment of body function shall be decided as a matter of law by the court. Likewise, if there is a factual dispute as to the nature and extent of a plaintiff's injuries, but the dispute is not material to the determination whether plaintiff has suffered a serious impairment of body function, the court shall rule as a matter of law whether the threshold requirement of MCL 500.3135; MSA 24.13135 has been met. [*Id.*, p 502.][28]

The first two sentences suggest that the question whether the plaintiff suffered a serious impairment of body function is always a question of law for the court. This is not true in practice. If a material factual dispute exists concerning plaintiff's injuries, the jury resolves the factual questions *and* decides whether the plaintiff's injuries seriously impaired a body function. See SJI2d 36.01.

The remainder of the paragraph suggests that the threshold issue is a question of law only when there is no material factual dispute as to the plaintiff's injuries. This language and logic is quite similar to that contained in GCR 1963, 117.2(3) (now MCR 2.116[C][10]), i.e., the trial court should grant a motion for summary judgment where

[28] T. G. KAVANAGH, J., in his partial dissent, would have followed *Advisory Opinion.* He reasoned that statutes (such as the no-fault act) which derogate common-law rights (such as the right to recover noneconomic damages) must be strictly construed. Since the Legislature chose an "amorphous standard," he believed this Court could not limit recovery to only the most serious injuries. 415 Mich 510.

there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

After careful reconsideration, we find that *Cassidy* is somewhat inconsistent with general rules of civil procedure. Even where there is no material factual dispute, a motion for summary disposition (as well as directed verdict and judgment notwithstanding the verdict) should not be granted if the facts can support conflicting inferences. 73 Am Jur 2d, Summary Judgment, § 27, p 754.

For example, in *McMillan v State Highway Comm,* 426 Mich 46; 393 NW2d 332 (1986), there was no material factual dispute as to the circumstances surrounding the motor vehicle accident at issue, or the construction and placement of the utility pole which plaintiff struck. After concluding that a private utility company could be held liable for negligent placement of a utility pole, we remanded the case to the trial court. We instructed the court that if the utility company should move for summary disposition on the basis that there was no genuine issue of material fact, the court must determine whether reasonable minds could nevertheless differ as to whether the company had acted negligently. We noted:

"If the facts bearing upon other aspects of 'proximate cause' (that is, aspects other than causation in fact) are not in dispute and reasonable persons could not differ about the application to those facts of the legal concept of 'proximate cause,' the court determines that issue. *But if reasonable persons could differ,* either because relevant facts are in dispute *or because application of the legal concept of 'proximate cause' to the case at hand is an evaluative determination as to which reasonable persons might differ, the issue of 'proximate cause' is submitted to the jury with appropriate instruc-*

*tions on the law."* [Prosser & Keeton, Torts (5th ed), § 45, p 321. Emphasis supplied. *Id.,* p 63, n 8.]

The same principles should be applied to the determination of whether the plaintiff sustained a § 3135(1) threshold injury.

In retrospect, the reasons given in *Cassidy* for requiring courts to determine threshold issues are not as compelling as they initially appeared. Although the phrase "serious impairment of body function" is an uncommon one,[29] juries are capable of understanding its component parts—"seriousness," "impairment," and "body function." Furthermore, juries are permitted to decide the threshold issue where the nature and extent of the plaintiff's injuries are in dispute.

As to the fear that automobile negligence litigation will dramatically increase, modifying this aspect of *Cassidy* will result in more noneconomic-loss cases going to trial. However, the pre-*Cassidy* case law did not require a trial in every case. Moreover, no-fault acts were designed primarily to reduce the number of cases seeking damages for *economic* loss, e.g., wage loss, survivor's loss, and medical expenses. Although § 3135(1) was designed to eliminate lawsuits seeking noneconomic damages for minor injuries, it cannot be said that the Legislature intended to wipe out almost all noneconomic-loss cases. The legislative history indicates that less stringent thresholds were adopted as a concession to attorneys performing personal injury work.

To those who argue that permitting more none-

[29] Until 1986 PA 178 was enacted, no other Michigan statute had employed a phrase similar to "serious impairment of body function." However, § 1483(1)(g) of that act, MCL 600.1483(1)(g); MSA 27A.1483(1)(g), provides that a person who has "lost a vital bodily function" is not subject to the $225,000 limit on noneconomic damages recoverable in a medical malpractice action.

conomic-loss cases to go to trial will cripple the no-fault system, we note that limiting tort liability for noneconomic losses is not an essential feature of no-fault acts. Several no-fault states place no limitations on the ability to sue for these damages. We also note that *Advisory Opinion* was decided shortly after the no-fault act became effective. The Legislature was therefore aware that threshold issues would generally be submitted to juries. The Legislature did not attempt to rectify this situation, however.

The final reason given by the *Cassidy* Court was the belief that the Legislature did not intend to leave threshold issues to the vagaries of juries. No such legislative intent is evident from the statutory language or legislative history. Moreover, trial and appellate courts have proven to be no more consistent than juries would have been in determining whether a particular plaintiff suffered a serious impairment of body function. Conflicting results have been reached by different Court of Appeals panels reviewing the same case.[30] Conflict-

[30] In *Burk v Warren,* 105 Mich App 556; 307 NW2d 89 (1981), the Court of Appeals initially concluded that a fractured clavicle, which was set by closed reduction, placed in a brace cast for one month, and healed without complications, constituted a serious impairment of body function. The panel did not believe that the temporary nature of the impairment was outcome determinative. After this Court remanded the case for reconsideration in light of *Cassidy,* a different panel concluded that plaintiff had not suffered a serious impairment. The panel emphasized that plaintiff had recovered completely within one month and was not seriously inconvenienced during his convalescence. 137 Mich App 715; 359 NW2d 541 (1984).

In *Range v Gorosh,* 121 Mich App 1; 328 NW2d 128 (1982), a sixty-year-old woman sustained fractures of the right clavicle, six ribs, and a small toe. She was hospitalized for four days, could not perform various household tasks for three months, and did not return to work full-time for seven months. Plaintiff experienced residual pain near her ribs and had difficulty breathing. There was also evidence that the accident had exacerbated plaintiff's existing heart and lung diseases. The jury returned a verdict of no cause of action. The Court of Appeals initially concluded that plaintiff's injuries did not constitute a serious impairment of body function as a matter of law and

ing results have also arisen among cases involving similarly injured plaintiffs.[31] This is undoubtedly because no two plaintiffs are injured or recover in precisely the same manner. These conflicting results indicate that threshold issues are often questions upon which reasonable minds can differ.

Properly instructed jurors are capable of weighing evidence and using their collective experiences to determine whether a particular plaintiff has suffered an impairment of body function and whether that impairment was serious. Their verdict represents the collective judgment of six people, as opposed to the views of one trial judge, and perhaps a panel of appellate judges reviewing a cold record. Without further guidance from the Legislature, we believe that juries are better suited to resolving threshold questions where reasonable minds can differ on the answer.[32]

---

that the case was properly submitted to the jury. After remand, a different panel concluded that plaintiff had suffered a serious impairment of body function as a matter of law. 140 Mich App 712; 364 NW2d 686 (1984).

[31] Clavicle fractures, sustained alone or in conjunction with other injuries, have proved to be difficult injuries to classify. In *Burk v Warren*, two Court of Appeals panels disagreed as to whether a young man, who sustained only a broken clavicle which healed without complications within a short time, had suffered a serious impairment of body function. Conflicting results were also reached where a sixty-year-old woman suffered a fractured clavicle, toe, and six ribs, recuperated over a relatively long period of time, and suffered residual problems. See *Range v Gorosh, supra.* In *LaHousse v Hess,* 125 Mich App 14; 336 NW2d 219 (1983), a young woman who fractured her clavicle and leg, and had a steel rod surgically implanted in her thigh, was found to have suffered a serious impairment of body function. No serious impairment was found, however, where a woman sustained a fractured clavicle and rib, was hospitalized for two days, and at one point lost forty percent of the range of motion in her shoulder due to adhesive capsulitis. *Wolkow v Eubank,* 139 Mich App 1; 360 NW2d 320 (1984). See also *Ulery v Coy,* 153 Mich App 551; 396 NW2d 480 (1986) (no serious impairment of body function where plaintiff had lost strength in her arm, the ability to grip, and some range of motion due to a bump on the clavicle and a chronic grade two acromioclavicular separation and atrophy of the shoulder.

[32] Several Court of Appeals judges have recently advocated a return

We therefore modify that portion of *Cassidy* which held that the trial court must decide whether the plaintiff suffered a serious impairment of body function whenever there is no material factual dispute as to the nature and extent of the plaintiff's injuries. If reasonable minds can differ as to whether the plaintiff suffered a serious impairment of body function, the issue must be submitted to the jury, even if the evidentiary facts are undisputed. Our holding marks a return to the rules articulated in *Advisory Opinion* and the Court of Appeals decisions which are consistent with that opinion. See *ante,* pp 50-54.

### V. STANDARD OF REVIEW

In *Kelleher v Kuchta,* 138 Mich App 45; 359 NW2d 224 (1984), the Court of Appeals attempted to articulate a standard for reviewing a trial court's ruling as to whether a plaintiff had, or had not, suffered a serious impairment of body function as a matter of law. To avoid appellate "second guessing" and accord some deference to the judge who viewed the evidence firsthand, the *Kelleher* majority concluded that the trial court's ruling should be affirmed unless it was clearly erroneous. *Id.,* p 47.[33]

---

to the pre-*Cassidy* practice of submitting threshold issues to the jury where reasonable minds can differ. See e.g., *Kelleher v Kuchta,* 138 Mich App 45, 49; 359 NW2d 224 (1984) (KELLY, J., concurring); *Routley v Dault,* 140 Mich App 190, 196; 363 NW2d 450 (1984) (KELLY, J., dissenting); *Pullen v Warrick,* 144 Mich App 356, 368; 375 NW2d 448 (1985) (KALLMAN, J., dissenting); *Esparaza v Manning,* 148 Mich App 371, 376, n 2; 384 NW2d 168 (1986).

Other states generally permit the jury to decide whether the plaintiff sustained a threshold injury. See, e.g., *Licari v Elliott,* 57 NY2d 230, 236-237; 455 NYS2d 570; 441 NE2d 1088 (1982); *Butchino v Bush,* 109 AD2d 1001; 486 NYS2d 478 (1985); *Martin v Young,* 443 So 2d 293 (Fla App, 1983).

[33] See also *Walker v Caldwell,* 148 Mich App 827, 831; 385 NW2d 703 (1986).

Judge KELLY disagreed with the "clearly errone-
ous" standard because it is generally used to re-
view the trial court's findings of fact, rather than
conclusions of law. He preferred a standard which
would require both trial and appellate courts to
view the facts in the light most favorable to the
nonmoving party and determine whether reason-
able minds could differ as to whether the plaintiff
had suffered a serious impairment of body func-
tion. Judge KELLY noted that this standard had
been used in pre-*Cassidy* decisions. *Id.,* pp 47-49.[34]

Judge KELLY correctly articulated the standard
for deciding motions for, and reviewing orders
granting or denying, summary disposition, directed
verdict, and judgment notwithstanding the verdict.
If a material factual dispute existed, or reasonable
minds could have differed on whether the plaintiff
sustained a serious impairment of body function,
the issue should have been submitted to the fact-
finder. If the issue was properly submitted to the
trier of fact, its findings generally should not be
disturbed. In a bench trial, the judge's findings of
fact must be affirmed unless they are clearly erro-
neous. *Tuttle v Dep't of State Highways,* 397 Mich
44, 46; 243 NW2d 244 (1976); MCR 2.613(C). In a
jury trial, the jury's findings of fact, as reflected in
its verdict, must be affirmed unless they are
against the great weight of the evidence. *Tuttle,*
pp 46-47, n 3.

## VI. "SERIOUS IMPAIRMENT" THRESHOLD IS A
SIGNIFICANT OBSTACLE

A few Court of Appeals opinions have suggested
that only catastrophically injured persons can sat-
isfy the "serious impairment of body function"

[34] See also *Bennett v Oakley,* 153 Mich App 622; 396 NW2d 451
(1986).

threshold.[35] This limitation supposedly stems from the following language in *Workman v DAIIE*, 404 Mich 477, 508-509; 274 NW2d 373 (1979):

> The legislative intent, inferable from the face of [§ 3135] is clear: *the Legislature intended to allow the catastrophically injured victim* and the victim of extraordinary economic losses *compensation in addition to that provided by §§ 3107 to 3110 of the act.* [Emphasis added.]

The *Workman* Court did not state that recovery of noneconomic damages was limited to the catastrophically injured. It was merely describing those persons who are clearly entitled to sue for losses not covered by the no-fault act. As previously noted, the Legislature specifically rejected amendments to § 3135(1) which would have required an "extraordinarily severe" injury, or a "major or extensive" disability.

The "serious impairment of body function" threshold is a significant, but not extraordinarily high, threshold. The three threshold injuries listed in § 3135(1) are not equivalent in severity. No disfigurement or injury is comparable to death. The "permanent serious disfigurement" and "serious impairment of body function" thresholds are not equivalent since the former contains a significant additional requirement—permanency. The Legislature refused to add this requirement to the latter threshold. The "serious impairment of body function" threshold was designed to eliminate suits based on clearly minor injuries, and those injuries which did not seriously affect the ability of the body, in whole or in part, to function.

---

[35] See, e.g., *Kanaziz v Rounds*, 153 Mich App 180; 395 NW2d 278 (1986); *Farquhar v Owens*, 149 Mich App 208, 211; 385 NW2d 751 (1986).

VII. AN IMPORTANT BODY FUNCTION
MUST BE IMPAIRED

The *Cassidy* Court judicially engrafted the requirement that the body function impaired must be important. The Court reasoned:

> The language "impairment of body function" is ambiguous regarding whether the impairment must be of *any* body function or of the *entire* body function. On the one hand, if *any* body function were to be considered the intended meaning, arguably a serious impairment of the use of the little finger would meet the threshold requirement. On the other hand, if an impairment had to be of the entire body function, then arguably only life-threatening injuries would satisfy the requirement. We believe that neither of these options accurately reflect the legislative intent and that impairment of body function is better understood as referring to important body functions. [415 Mich 504.]

We agree that § 3135(1) does not require the entire functioning of the body to be seriously impaired. Such an interpretation would essentially limit recovery of noneconomic damages to the catastrophically injured. However, it is questionable whether the *Cassidy* Court should have imposed the requirement that the body function impaired be important. The legislative history indicates that a comparable threshold—"serious impairment of *significant* body functions"—was rejected. Moreover, the Legislature recently used the phrase "los[s of] a *vital* bodily function" to describe one class of injuries which are not subject to the

$225,000 limit on noneconomic damages recoverable in medical malpractice actions.[36]

Rather than judicially imposing a requirement which the Legislature clearly rejected, it would be preferable to focus on the Legislature's overall intent to bar recovery of noneconomic damages to those who suffered minor or superficial injuries. It may be possible to describe a minor injury as a serious impairment of *some* body function. However, we believe the judiciary is fully capable of weeding out trivial cases without having to determine whether the body function impaired is important.

### VIII. "GENERAL ABILITY TO LIVE A NORMAL LIFE" TEST

This test arose during the discussion of whether Leo Cassidy had suffered a serious impairment of body function:

> Walking is an important body function that for Leo Cassidy was impaired by his broken bones. This conclusion is not affected one way or the other by the fact that Leo Cassidy is a potato farmer who must be on his feet for long hours. We believe that the Legislature intended an objective standard that looks to the effect of an injury on the person's general ability to live a normal life. [415 Mich 505.]

The "general ability to live a normal life" test has been criticized by both plaintiffs' and defendants' attorneys.[37] The most obvious problem is defining what constitutes "a normal life." The Court of Appeals has never attempted to define the phrase, since it usually concludes that the injuries sustained did not significantly affect the

---

[36] See n 29.

[37] See Gromek & Bosh, *Impair the threshold—Cripple the system,* 65 Mich Bar J 640, 644 (1986); Ransom & Sinas, *The evolving no-fault tort threshold,* 65 Mich Bar J 528, 530-531 (1986).

*plaintiff's* life style or daily activities.[38] However, relief has been denied where the injuries did significantly affect the plaintiff's normal life style and activities.[39]

The Court of Appeals has repeatedly stated that mere difficulty in performing activities is not sufficient to establish a serious impairment of body function.[40] In denying relief, panels often note that the plaintiff was not "incapacitated" or "confined to bed."[41] Short shrift is usually given to the fact that the plaintiff is no longer able to engage in the recreational activities he previously enjoyed.[42] However, if the plaintiff can still perform such

[38] See, e.g., *Denson v Garrison,* 145 Mich App 516, 520; 378 NW2d 532 (1985); *Routley,* n 32 *supra,* p 195; *McDonald v Oberlin,* 127 Mich App 73, 75-76; 338 NW2d 725 (1983).

[39] In *Franz v Woods,* 145 Mich App 169; 377 NW2d 373 (1985), plaintiff testified that she and her husband were "athletic, outdoorsy types." Plaintiff sustained moderate soft tissue injuries, which caused constant pain and prevented her from engaging in any demanding physical activity. As a result, plaintiff's husband left her for "a more active female companion." Plaintiff quit her jobs as a bowling-center manager and waitress because of her pain and the stress of childrearing. She could perform some light housework, but delegated laundry and dishwashing chores to her children.

The Court of Appeals affirmed the trial court's order granting a directed verdict to defendant. The Court admitted that plaintiff's injuries had significantly interfered with her normal life style. However, plaintiff still had the general ability to live a normal life because she could perform "common day-to-day activities." Although her work and social activities had been significantly curtailed, the Court did not believe her injuries were "on a par with death or serious permanent disfigurement." *Id.,* pp 177-178.

[40] See, e.g., *Kanaziz,* n 35 *supra; Meklir v Bigham,* 147 Mich App 716, 720; 383 NW2d 95 (1985); *Morris v Levine,* 146 Mich App 150, 154; 379 NW2d 402 (1985); *Vreeland v Wayman,* 141 Mich App 574, 577; 367 NW2d 362 (1985); *Guerrero v Schoolmeester,* 135 Mich App 742, 751; 356 NW2d 251 (1984), lv den 422 Mich 881 (1985).

[41] See, e.g., *Meklir,* n 40 *supra; Routley,* n 32 *supra; Jakubiec v Kumbier,* 134 Mich App 773, 777; 351 NW2d 865 (1984); *Braden v Lee,* 133 Mich App 215, 218; 348 NW2d 63 (1984); *McDonald,* n 38 *supra,* p 76. Cf. *Range v Gorosh (After Remand),* n 30 *supra,* p 718; *Harris v Lemicex,* 152 Mich App 149, 154; 393 NW2d 559 (1986).

[42] See, e.g., *Morris,* n 40 *supra,* p 152.

activities, this indicates that he is able to live a
normal life.[43]

If the plaintiff eventually returned to work, even
after an absence of several months, the Court of
Appeals has usually concluded that there has been
no significant interference with the plaintiff's nor-
mal life.[44] This is true even if permanent medical
restrictions have been placed on plaintiff's ability
to lift or perform certain types of work.[45] Restric-
tions imposed by the plaintiff, rather than his
doctor, are usually ignored.[46] Relief has generally
been denied to plaintiffs who eventually regained
their full range of motion, even if the initial
limitation was significant.[47]

In short, the Court of Appeals has strictly ap-
plied the "general ability to live a normal life"
test. If the plaintiff can perform common day-to-
day activities, albeit with some difficulty, or can
eventually return to work, the plaintiff is usually
deemed not to have suffered a serious impairment

[43] See *Vreeland,* n 40 *supra.*

[44] See, e.g., *Salim v Shepler,* 142 Mich App 145, 148; 369 NW2d 282
(1985) (three and one-half month absence); *Routley,* n 32 *supra* (nine
and one-half months); *Braden,* n 41 *supra* (four months); *McDonald,* n
41 *supra* (three months).

[45] See, e.g., *Walker,* n 33 *supra,* p 829 (twenty-pound lifting restric-
tion); *Franz,* n 39 *supra,* p 177 (limited bending and twisting, twenty-
to twenty-five-pound lifting restriction); *Salim,* n 44 *supra,* p 147
(plaintiff must avoid activities involving excessive or repetitive reach-
ing and pulling); *Routley,* n 32 *supra,* p 194 (thirty- to forty-pound
lifting restriction); *Kucera v Norton,* 140 Mich App 156, 158; 363
NW2d 11 (1984) (plaintiff required helper to do heavy lifting).

[46] See, e.g., *Bennett,* n 34 *supra; Denson,* n 38 *supra; Franz,* n 39
*supra; Sherrell v Bugaski,* 140 Mich App 708, 711; 364 NW2d 684
(1984).

[47] See, e.g., *Clark v Auto Club Ins Ass'n,* 150 Mich App 546; 389
NW2d 718 (1986) (fifty-percent impairment of lower spine movement
improved over time); *Mills v Jolliff,* 147 Mich App 746; 383 NW2d 134
(1985) (thirty- to forty-percent limitation of neck movement reduced
to five to fifteen percent after one and one-half years); *Page v Clark,*
142 Mich App 697; 370 NW2d 15 (1985) (severely restricted neck
movement rectified after three months); *Wolkow,* n 31 *supra* (forty-
percent limitation in shoulder motion rectified after four months of
physical therapy).

of body function. The bottom line is that few plaintiffs have been given the opportunity to recover noneconomic damages since *Cassidy* was decided.[48]

The "general ability" test was an attempt to devise an objective standard for evaluating the effect of an injury upon the body's ability to function. To the extent that the *Cassidy* Court refused to focus solely on how the injury affected the particular plaintiff's way of life, we agree that this was not the intent behind § 3135(1). Unlike other states, the Legislature did not enact a threshold which looks at how the injury affected the plaintiff's ability to work or perform his normal activities. Instead, the relevant inquiries are whether the injury impaired a body function and, if so, whether that impairment was serious.

Focusing on the effect an injury has on a particular person's life can lead to anomalous results. Suppose a concert violinist sustains severe permanent injuries to his legs in an auto accident and is required to use a wheelchair. If the violinist previously lived a sedentary life and has a good mental outlook, the injury may not seriously affect his daily routine, work, or recreational activities. However, he has clearly suffered a serious impairment of body function.

Suppose the same violinist suffers a permanent loss of dexterity in his little finger. Although the injury does not prevent the violinist from perform-

[48] The plaintiff was found to have sustained a serious impairment of body function, as a matter of law, in only four cases—*Harris v Lemicex*, n 41 *supra*, *Esparaza v Manning*, n 32 *supra*, *Range v Gorosh (After Remand)*, n 30 *supra*, and *LaHousse v Hess*, n 31 *supra*. Plaintiffs were permitted to submit the threshold issue to the jury because a material factual dispute existed in *Akin v Slocum*, 153 Mich App 337; 395 NW2d 269 (1986), *Galli v Reutter*, 148 Mich App 313; 384 NW2d 43 (1985), *Van Every v SEMTA*, 142 Mich App 256; 369 NW2d 875 (1985), and *Argenta v Shahan*, 135 Mich App 477; 354 NW2d 796 (1984), rev'd on other grounds 424 Mich 83 (1985).

ing routine tasks with his hand, the injury has effectively ruined his performing career. The violinist undoubtedly suffers more mental anguish than a similarly injured soccer player. However, the "serious impairment of body function" threshold bars recovery of noneconomic damages for minor injuries, regardless of how seriously the injury affects a particular person's life. The violinist can only recover his medical expenses and wage loss.

A test which merely compares the activities which the plaintiff could perform before and after the accident could reward the malingerer or hypochondriac, while penalizing the person who cannot afford to miss work or tries to function despite the pain.[49] However, a test which attempts to compare the plaintiff's post-accident activities and abilities to a hypothetical person's "normal life" is equally flawed. Very simply, there is no such thing as "a normal life." Determining which activities are essential to living a normal life is an equally impossible task.

The "general ability to live a normal life" test, as applied by the Court of Appeals, has proved to be an almost insurmountable obstacle to recovering noneconomic damages. Apparently, only plaintiffs who are bedridden, cannot care for themselves, or are unable to perform any type of work can satisfy this test. This was not the intent of the

---

[49] In *Braden v Lee,* n 41 *supra,* plaintiff returned to work against the advice of his personal physician because the company doctor believed he could work. The Court of Appeals concluded that plaintiff had not suffered a serious impairment of body function in part because he could still perform employment-related tasks, albeit with some pain.

In *Kucera v Norton,* n 45 *supra,* plaintiff missed very little work, but received chiropractic treatments for his back injuries for over two and one-half years. He required an assistant to do heavy lifting and could not engage in certain recreational activities. The Court of Appeals, in denying relief, emphasized plaintiff's lack of absenteeism and wage loss.

Legislature. Rather than clarifying what injuries are sufficiently serious to meet the "serious impairment of body function" threshold, the test has obfuscated the true nature of the threshold inquiry. We therefore discard the test in favor of an objective approach which we believe is more consistent with the statutory language and legislative intent.

### IX. DETERMINING WHETHER PLAINTIFF SUFFERED A SERIOUS IMPAIRMENT OF BODY FUNCTION

The "serious impairment of body function" threshold contains two straightforward inquiries:

1) What body function, if any, was impaired because of injuries sustained in a motor vehicle accident?

2) Was the impairment serious?

The focus of these inquiries is not on the injuries themselves, but how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent, and permanency of the impairment. Identifying which body functions were impaired is a relatively easy task. Determining whether the impairment was serious requires a much more complicated evaluation of factors.

The extent of an impairment is often expressed in numerical terms. A person who suffers a permanent seventy-five-percent limitation in back movement has clearly suffered a serious impairment of back function, while a person with a permanent five-percent limitation probably has not. However, the particular body function impaired may also make a difference. A ten-percent permanent reduction in brain functioning is a more serious impairment of body function than a ten-percent limitation in neck motion.

The length of time the impairment of body function lasts must also be considered. A person who is rendered unconscious for several minutes at the scene of the accident has suffered a substan-ʼ tial impairment of brain functioning during those minutes. If there are no further problems, the impairment overall does not appear serious. A permanent impairment is more serious than a temporary impairment of like character. However, the fact that the plaintiff eventually makes a complete recovery should not negate the fact that he endured a serious impairment of body function for a significant period of time. A permanent impairment may or may not be serious, depending on the extent of the impairment and body function affected.

The type of treatment required to rectify the impairment may also be relevant. An impairment which can only be corrected by surgery may be more serious than one that can be remedied by bed rest. A comparison of the plaintiff's abilities and activities before and after the accident may be relevant insofar as it establishes the existence, extent, and duration of an impairment of body function. Additional relevant factors may also be considered in determining seriousness.[50]

We believe that this approach will not penalize the person who returns to favored work, or reward the malingerer who has little medical basis for his complaints. The effect of the injury on the plaintiff's body functions is the paramount considera-

---

[50] Similar reasoning was used in *Hermann v Haney*, 98 Mich App 445, 449-450; 296 NW2d 278 (1980), aff'd 415 Mich 483; 330 NW2d 22 (1982). We have not adopted the *Hermann* Court's reasoning verbatim because it tends to focus on the seriousness of the *injuries*, rather than the seriousness of the *impairment* of body function caused by the injuries.

tion, rather than the effect of the injury on the plaintiff's (or a hypothetical person's) life.[51]

The question whether the plaintiff suffered a serious impairment of body function must be submitted to the trier of fact whenever the evidence, viewed in the light most favorable to the nonmoving party, is such that reasonable minds could differ as to the answer. To ensure that the jury fully understands the nature of the threshold inquiry, the jury should be instructed on the following points:

1) To recover noneconomic-loss damages, the plaintiff must prove that the injuries he sustained in the motor vehicle accident impaired one or more body functions, and that the impairment of body function was serious.

2) In determining whether the impairment of body function was serious, the jury should consider such factors as the extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other

[51] New York courts employ a similar analysis in determining what constitutes a "significant limitation of use of a body function or system." In *Licari v Elliott*, n 32 *supra*, p 235, plaintiff sustained a concussion, acute cervical sprain, acute dorsal lumbar sprain, and chest contusion. He was initially examined at a hospital for two hours, but was readmitted two days later for further tests. One doctor testified that plaintiff had suffered only "a very mild limitation" of back and neck movement. Plaintiff returned to his job as a cab driver twenty-four days after the accident. He testified that he could not help fares with their luggage or his wife with certain household tasks. He also suffered from occasional headaches and dizziness, which were relieved by aspirin.

The New York Court of Appeals held that plaintiff had offered no evidence as to the extent of the limitation of movement. At most, plaintiff established that he had suffered a painful sprain, which limited his back and neck motion somewhat. There was no evidence that his injuries had caused a significant limitation of body function. The court focused primarily on the lack of medical testimony as to the extent of plaintiff's limitations, rather than the way the injuries had inconvenienced him.

relevant factors. An impairment need not be permanent to be serious.[52]

### X. INJURY MUST BE "OBJECTIVELY MANIFESTED"

This requirement stems from the following discussion in *Cassidy:*

> Another significant aspect of the phrase "serious impairment of body function" is that it demonstrates the legislative intent to predicate recovery for noneconomic loss on objectively manifested injuries. Recovery for pain and suffering is not predicated on serious pain and suffering, but on injuries that affect the functioning of the body. Leo Cassidy's injuries were not general aches and pains, but rather two broken bones. [415 Mich 505.]

In *Williams v Payne,* 131 Mich App 403, 409-410; 346 NW2d 564 (1984), the Court of Appeals distinguished objectively manifested injuries from objectively manifested symptoms. After concluding that plaintiff wife's soft tissue injuries to her

---

[52] These jury instructions are substantially more detailed than those contained in SJI2d 36.01:

> The law in Michigan provides that plaintiff may recover (noneconomic loss) damages in this case if he suffered serious impairment of body function. Based upon the evidence in this case, you must decide whether plaintiff suffered an impairment of body function and, if so, whether that impairment was serious.
>
> Serious impairment of body function requires that the impairment be of an important body function.
>
> An impairment need not be permanent to be serious.

We wish to point out that in the three cases in which the jury found no serious impairment (*DiFranco, Burk,* and *Paupore*) the SJI requirement that the function impaired be an "important" one was not included in the instructions given. Further, in none of these cases was an objection raised to the serious impairment instructional language.

thumb had not seriously impaired any important body function, the Court stated:

> Additionally, Mrs. Williams' soft tissue injuries were not subject to medical measurement. Thus, they are not "objectively manifested" in a scientific or medical context. The symptoms of her injuries, however, have found objective manifestation: pain makes certain activities difficult. The *Cassidy* opinion did not expressly designate which standard of manifestation to employ, objective medical measurements of injury or a patient's complaints of pain substantiated only by the patient's limited activities. We conclude that Mrs. Williams' injuries are not "objectively manifested" within the meaning of *Cassidy.* Medically unsubstantiated pain will always be present in a tort action for pain and suffering. The Legislature could not intend so low a threshold for avoiding the no-fault act's proscription against tort actions. General pain and suffering is not sufficient to meet the threshold. . . . Additionally, the *Cassidy* decision spoke of "objectively manifested *injuries,*" not symptoms. Mrs. Williams' injuries do not meet the "objectively manifested" requirement.

Defendants urge us to adopt the *Williams* Court's interpretation of *Cassidy.* They believe that an injury which cannot be directly demonstrated through the use of accepted medical tests or procedures, but must be diagnosed on the basis of the plaintiff's subjective complaints, a physician's clinical impressions, or the symptoms resulting from the injury, is not objectively manifested. Their reasoning is as follows:

A physical examination yields subjective complaints and objective findings. Subjective complaints are those perceived only by the patient which cannot be otherwise measured, e.g., pain, nausea, and blurred vision. Objective findings are those which the physician can see for himself, e.g.,

swelling and inflammation. Some procedures involve a combination of subjective complaints and objective findings, e.g., range-of-motion tests, where the doctor manipulates the patient's body until the patient complains of pain or is unable to move further. Doctors use subjective complaints and objective findings to form clinical impressions and diagnoses. To verify these clinical impressions, the doctor usually orders tests, such as x-rays, arthrograms, CAT-scans, blood tests, and the like.

Defendants argue that the injury itself (e.g., broken bones, torn cartilage, etc.) must either be directly perceivable (i.e., the doctor must be able to see, hear, or touch the injury), or the nature and extent of the injury must be demonstrated through a medically accepted test. Symptoms or effects caused by the injury (e.g., spasms, swelling, and pain) are supposedly insufficient to satisfy *Cassidy's* requirement of objectively manifested injuries.

Thus, broken bones seen on x-rays clearly satisfy defendants' interpretation of *Cassidy*. However, injuries to soft tissues generally cannot be seen or felt. Seeing or feeling the symptoms of torn or stretched muscles or ligaments (e.g., spasms) is not enough. Nor are plaintiff's subjective complaints of pain or limited motion. Therefore, defendants believe that, in most cases, soft tissue injuries cannot be the basis of a finding that the plaintiff suffered a serious impairment of body function because these injuries are not objectively manifested.

The Court of Appeals has not always accepted this rigid distinction between injuries and symptoms. As a result, panels have disagreed on whether certain manifestations of soft tissue injuries, such as muscle spasms,[53] swell-

[53] Muscle spasms were found to be objective manifestations of soft tissue injuries in *Bennett,* n 34 *supra, Harris,* n 41 *supra,* pp 153-154,

ing,[54] tenderness,[55] and loss of lordosis,[56] satisfy *Cassidy.* Panels have also disagreed as to whether the conclusions drawn from range-of-motion tests are an objective manifestation of an injury. Some panels have summarily disregarded the results of these tests, especially if the plaintiff's x-rays were normal and no neurological problems were discovered.[57] Other panels have distinguished between "active" and "passive" range-of-motion tests. Under this approach, the results of an active test (i.e., a test where the plaintiff moves her body until she feels pain) are not considered an objective manifestation of an injury because the plaintiff can control the test results.[58] However, the limitation of movement observed in passive tests is considered an objective manifestation of an injury.[59]

The *Williams'* interpretation of *Cassidy's* "objectively manifested injury" language has proved to be an almost insurmountable obstacle to recovery of noneconomic damages in soft tissue injury cases. Judge RAVITZ, dissenting in *Garris v Vanderlaan,* 146 Mich App 619, 627-628; 381 NW2d 412 (1985), roundly criticized the *Williams* Court's reasoning:

and *Franz,* n 39 *supra,* p 176; but not in *Clark,* n 47 *supra,* p 553, *Morris,* n 40 *supra,* p 154, and *Flemings v Jenkins,* 138 Mich App 788, 790; 360 NW2d 298 (1984).

[54] Swelling was found to be an objective manifestation of injury in *Pullen,* n 32 *supra,* p 365.

[55] Tenderness was deemed an objective manifestation of injury in *Bennett,* n 34 *supra;* but not *Clark,* n 47 *supra, Morris,* n 40 *supra, Franz,* n 39 *supra,* p 177, and *Flemings,* n 53 *supra.*

[56] Although loss of lordosis (i.e., the natural curvature of the spine) can be seen on x-rays, *Guerrero,* n 40 *supra,* p 750, held that the cause of the loss (i.e., torn or stretched muscles and ligaments) was not objectively manifested. In other words, loss of lordosis is only an objectively manifested symptom of a soft tissue injury. *Sherrell,* n 46 *supra,* p 711, reached a contrary conclusion.

[57] See *Morris,* n 40 *supra,* p 154; *Flemings,* n 53 *supra; Williams v Payne,* 131 Mich App 411.

[58] See *Franz,* n 39 *supra,* p 175; *Salim,* n 44 *supra,* p 149.

[59] See *Galli,* n 48 *supra,* p 318; *Argenta,* n 48 *supra,* pp 488-489.

The "medical measurement" test espoused in
*Williams* is a convenient method for reducing
litigation in automobile cases. However, it is not
rationally related to the Legislature's goal of pre-
venting over-compensation for minor injuries. Soft-
tissue injuries and psychiatric trauma are difficult
or impossible to measure medically. Yet, persons
who suffer with these injuries for years would
certainly gladly trade places with those who suffer
a badly fractured bone and are incapacitated for 6
or 7 months, but who thereafter are able to lead
perfectly normal lives. . . .

*Williams v Payne* suggests that the only alterna-
tive to the "medical measurement" test is the use
of the "patient's complaints of pain substantiated
only by the patient's limited activities." 131 Mich
App 410. Where the ordinary means of diagnosis
and prescription of treatment are such subjective
indications from a patient, a doctor's diagnosis of
injury should suffice to satisfy the objective mani-
festation requirement announced in *Cassidy*. . . .

. . . To deny recovery because such injuries are
not capable of "medical measurement" denies com-
pensation to a large class of individuals who suffer
a greatly reduced quality of life as a result of
automobile accidents. Clearly, the Legislature did
not intend such an arbitrary hurdle as that im-
posed by the "medical measurement" test.

We agree that *Williams* misinterpreted *Cassidy*.
The *Cassidy* Court was concerned that plaintiffs
could recover noneconomic damages merely by
testifying that they had suffered extreme pain
following a motor vehicle accident. Recognizing
that the Legislature only permitted recovery for
injuries which seriously impair body functions, the
Court required plaintiffs to establish that they had
suffered such an injury. In other words, plaintiffs
must introduce evidence establishing that there is
a physical basis for their subjective complaints of
pain and suffering. Neither *Cassidy* nor § 3135(1)

limits recovery of noneconomic damages to plaintiffs whose injuries can be seen or felt.

As noted in part IX, medical testimony generally will be required to establish the existence, extent, and permanency of the impairment of body function. We disapprove of those cases which have automatically disregarded certain types of evidence merely because it was based upon the plaintiff's subjective complaints or the symptoms of an injury. An expert's diagnosis and the basis for it (e.g., the plaintiff's complaints, the physician's observations, and test results) can be adequately challenged at trial through cross-examination and the presentation of contrary medical evidence. The "serious impairment of body function" threshold requires the plaintiff to prove that his noneconomic losses arose out of a medically identifiable injury which seriously impaired a body function. The *Cassidy* Court required no more than this.

## XI. LIMITED RETROACTIVE APPLICATION OF THIS DECISION

Since several of today's holdings are new or inconsistent with those articulated in *Cassidy,* our decision applies to the five cases before us as well as to: (1) currently pending appeals in which an issue concerning the proper interpretation of the statutory phrase "serious impairment of body function" has been raised, (2) trials in which a jury is instructed after the date of this decision, and (3) cases in which summary disposition enters after the date of this decision.

## XII. APPLICATION OF LAW TO CASES

### A. DiFRANCO v PICKARD

Plaintiff's vehicle was struck from behind by

defendant on May 20, 1978. He was taken by ambulance to a hospital, complaining of pain in his neck, shoulders, and lower back. Plaintiff was given a cervical collar and released with instructions to contact his personal physician if he experienced further problems.

On May 24, 1978, plaintiff was examined by a physician. Muscle spasms were observed in plaintiff's neck and lower back. Active range-of-motion tests indicated a forty- to fifty-percent limitation in lower-back motion, and a thirty- to forty-percent limitation in neck motion. X-rays revealed a decreased lordosis in the cervical (upper) spine, and a mild rotary scoliosis of the thoracic (lower) spine. The physician concluded that these spinal abnormalities were due to muscle spasms, caused by the stretching or tearing of muscles and ligaments, as well as internal bruising. He gave plaintiff a muscle relaxant and a lumbosacral support.

Plaintiff was admitted to the hospital for diagnostic tests, physiotherapy, and traction from June 20 to 24, 1978. No neurological problems were found. Plaintiff continued treatment through July, 1978, and once during July, 1979, for continuing neck and back pain. He reexamined plaintiff on January 17, 1983, shortly before trial. Spasms were detected and x-rays again revealed a decreased cervical lordosis and a mild rotary scoliosis. Degenerative arthritis was also detected in the lower spine, which was secondary to the trauma suffered in the area. Plaintiff's range of motion had improved, but he still suffered a five- to fifteen-percent loss of neck motion, and a ten- to fifteen-percent loss of lower-back motion.

Plaintiff's doctor described plaintiff's condition as chronic. He could neither confirm nor deny the possibility of a disc injury. The doctor noted that plaintiff had previously suffered neck and back

problems, which had made him more susceptible to injury. However, he believed that plaintiff's current problems were directly related to the auto accident. Hot baths and home traction could relieve plaintiff's pain somewhat, but his arthritis would inevitably progress.

Plaintiff stated that he was twenty-two years old at the time of the accident and had previously led an active life. He testified as to the continued stiffness and pain in his neck and lower back, the curtailment of most of his sports activities, and the inconveniences he experienced in his daily life. He treated himself frequently with hot baths, heating pads, and massage. He occasionally used a home-traction device when he overexerted himself.

Plaintiff returned to his job as a hospital x-ray technician two months after the accident, with his doctor's permission. No work restrictions were imposed, although plaintiff performed lifting activities cautiously. He left this job in October, 1978, to become a service representative for a copying machine company. This job occasionally entailed moving or crawling under large machines. Other than the two-month absence immediately following the accident, plaintiff had not been absent from his job because of his back and neck problems.

The case was tried shortly after *Cassidy* was decided. Defendant admitted negligence and did not contest plaintiff's medical evidence. However, he maintained that plaintiff had not suffered a serious impairment of body function. The district court denied motions by plaintiff and defendant for a directed verdict, believing that reasonable minds could differ on the threshold issue. The jury found that defendant's negligence was the proximate cause of plaintiff's injuries, but that plaintiff had not suffered a serious impairment of body function. The Macomb Circuit Court affirmed the judgment

for defendant. The Court of Appeals denied plaintiff's application for leave to appeal.

The undisputed medical evidence demonstrated that plaintiff sustained soft tissue injuries to the muscles and ligaments of his neck and back. These injuries impaired two of plaintiff's body functions —the ability to move his neck and lower back. Since the nature and extent of plaintiff's injuries were not disputed, it must be determined if reasonable minds could differ as to whether the impairment was serious.

We conclude that the district court properly denied plaintiff's motion for a directed verdict. Plaintiff's overall impairment was not so extensive or long term that all reasonable minds would conclude that it was serious. Although plaintiff's injuries initially impaired his ability to move his lower back by forty to fifty percent, and his neck by thirty to forty percent, his limitations at the time of trial were relatively slight (five to fifteen percent). He was also able to return to work within two months with no medical restrictions.

Although it is a closer question, we conclude that the district court properly denied defendant's motion for a directed verdict. Plaintiff's initial impairment was substantial, lasted two months, and required traction and physiotherapy. The residual impairment is permanent. Plaintiff's inability to move his lower back will steadily increase as his arthritis progresses. We cannot say that all persons would conclude that plaintiff's impairment was not serious.

Therefore, the threshold issue was properly submitted to the jury. Since the jury found that plaintiff had not sustained a serious impairment of body function, and this finding is not against the great weight of the evidence, we affirm the judgment for defendant.

*B. BURK v WARREN*

On June 1, 1976, plaintiff was hit by defendant's truck as he was traveling thirty miles per hour on his motorcycle. He suffered a fractured right clavicle (collarbone), as well as abrasions and bruises on his hand, knee, and shoulder. Plaintiff was taken to the hospital, treated, and released. The fracture was set by closed reduction. Plaintiff wore a brace cast for four to six weeks, which completely immobilized his right shoulder and arm. The fracture healed properly without complications.

Plaintiff testified that he was able to do very little and could not sleep during the week following the accident. He contacted a family physician, who prescribed medication to ease the pain and help plaintiff sleep. After the cast was removed, plaintiff gradually resumed most of his physical activities, including jogging, tennis, and yard work. However, he still experienced pain when he engaged in certain activities.

Plaintiff's physician testified that clavicle fractures generally do not cause future problems, although the patient may suffer occasional slight pain several months after the injury healed. The brace cast prevented plaintiff from using his right shoulder and arm. When he examined plaintiff six weeks after the accident, the fracture had healed and there was no tenderness at the fracture site. Plaintiff still experienced some pain and had a slight protuberance on his collarbone, but these were normal conditions which would subside. No restrictions were placed on plaintiff's activities.

The case was tried in September, 1979. Neither party moved for a directed verdict. The jury found that defendant was negligent and had proximately caused plaintiff's injuries. However, the jury con-

cluded that plaintiff's injuries did not cause a serious impairment of body function. Plaintiff moved for judgment notwithstanding the verdict or a new trial, claiming that he had sustained a serious impairment of body function as a matter of law. The Ingham Circuit Court denied the motion.

The Court of Appeals found that for the relatively short period of time plaintiff was convalescing, the use of his arm and shoulder was greatly reduced. The Court refused to impose a requirement that the serious impairment be permanent or lengthy. It also noted that the no-fault statute is remedial and should be liberally construed in favor of accident victims. The Court concluded that plaintiff had sustained a serious impairment of body function as a matter of law. 105 Mich App 556; 307 NW2d 89 (1981).

Defendant's application for leave to appeal was held in abeyance pending this Court's decision in *Cassidy*. The case was thereafter remanded to the circuit court with instructions to proceed in the manner outlined in *Cassidy*. 417 Mich 959 (1983). The circuit court found, as a matter of law, that plaintiff had suffered a serious impairment of body function. It awarded $3000 in damages plus costs, interest, and fees.

On appeal, a different Court of Appeals panel found that the injury was objectively manifested and that the functioning of the shoulder and arm is an important body function. However, the Court noted that plaintiff could use his right hand and had no trouble eating. He did not sustain a compound fracture and wore a brace cast for only one month. Moreover, there was no permanent or long-range effect from the injury. The second panel concluded that plaintiff had not suffered a serious impairment as a matter of law. 137 Mich App 715; 359 NW2d 541 (1984).

The undisputed evidence established that plaintiff suffered an injury which prevented him from moving or using his right shoulder and arm. This total impairment of body function lasted four to six weeks. As evidenced by the disparate results reached by the Court of Appeals, however, reasonable minds could differ as to whether plaintiff's impairment *overall* was serious. As the first panel noted, a fractured clavicle is a relatively common injury, which generally requires only a brace cast and heals with few complications. Plaintiff in fact healed quickly and suffered no permanent residual impairment.

We conclude that the case was properly submitted to the jury. Since the jury's finding that plaintiff did not sustain a serious impairment was not against the great weight of the evidence, it should not be disturbed.

### C. PAUPORE v ROUSE

Plaintiff was a passenger in a car owned by defendant Betty Rouse and driven by her son, Gerald Rouse, when it was involved in a serious one-car accident on September 11, 1980. Plaintiff sustained a severe fracture of his right and left lower jaw, and a displaced wisdom tooth. Plaintiff presented several doctors at his April, 1983, trial.

David Howard, D.D.S., testified that he examined plaintiff at the hospital shortly after the accident. Plaintiff was hospitalized for six days. During this period, plaintiff's wisdom tooth was surgically removed from his throat and the broken portions of his jaw were repositioned and wired together. Arch bars were inserted onto plaintiff's teeth and his mouth was wired together. The swelling from the surgery made eating and talking difficult for one week. Thereafter, plaintiff could

speak and consume a liquid diet relatively well, although he could not chew.

Dr. Howard unwired plaintiff's mouth on October 23, 1980, but left the arch supports in place. Plaintiff's mouth was rewired one week later because of some movement at the fracture site. The wires were permanently removed on December 22, 1980. Dr. Howard stated that plaintiff's jaw had healed satisfactorily.

Because plaintiff could not adequately clean his mouth while it was wired, an infection developed where the wisdom tooth had been displaced. Three other wisdom teeth had to be extracted, one surgically. Dr. Howard acknowledged that these teeth might have needed to be removed regardless of the accident. Since wisdom teeth are nonfunctional, their removal did not interfere with the functioning of plaintiff's mouth.

Stephen Beeker, D.D.S., testified that he examined plaintiff in 1981 after his jaw had healed. Because plaintiff's teeth did not fit together properly, he recommended comprehensive orthodontic treatment, which could include further surgery on the jaw. The active phase of treatment would last eighteen to twenty-four months. (Plaintiff did not undergo this treatment.) Dr. Beeker believed that earlier injuries to plaintiff's jaw might have caused some malocclusion, but the problem became more evident to plaintiff after the accident.

Because of fluid build-up behind the eardrums, plaintiff temporarily lost thirty percent of his hearing. When Dr. Denton Nelson examined plaintiff on December 15, 1980, he recommended conservative treatment, i.e., decongestant nasal sprays and attempts to inflate air into the ears. By January 19, 1981, Dr. Nelson suggested making incisions into the eardrums and inserting tubes to permit drainage. By February 4, 1981, the problem

with the left ear had cleared. Dr. Nelson decided not to perform surgery on the right ear. Plaintiff did not return for further treatment. On cross-examination, defendant attempted to show that the fluid build-up could have been caused by problems not related to the accident. Nevertheless, Dr. Nelson believed that plaintiff's hearing loss was related to the trauma of the fractured jaw.

Plaintiff testified that he lost fifteen to twenty pounds due to his liquid diet. His jaw was swollen for almost one month. To reduce the pain, he consumed three bottles of codeine elixir. He continued to experience occasional pain in his mouth, ears, and back.

Defendants presented Brenda Moyer, a friend with whom plaintiff resided for one and one-half months after he was released from the hospital. She testified that plaintiff's life style did not change significantly after the accident. He worked on his van, danced, and drank at a local bar shortly after he was discharged from the hospital, and spent much of his time at the beach. Plaintiff could talk and sing with his mouth wired together and did not appear to be in pain. Ms. Moyer acknowledged that plaintiff took pain medication during this time.

Plaintiff moved for a directed verdict on the issues of negligence, proximate cause, and serious impairment. The Grand Traverse Circuit Court denied the motion because a material factual dispute existed. The jury found that Gerald Rouse had been negligent and that his negligence had proximately caused plaintiff's injuries. However, the jury concluded that plaintiff had not suffered a serious impairment of body function or permanent serious disfigurement.

The Court of Appeals affirmed the judgment for

defendants.[60] Viewing the evidence in the light most favorable to defendants, the Court found that there was a material factual dispute as to the nature and extent of plaintiff's injuries which precluded a directed verdict on the serious impairment issue.

Contrary to the Court of Appeals conclusion, the nature and extent of plaintiff's injuries were not disputed. The undisputed evidence showed that plaintiff had sustained a fractured jaw, ultimately lost four wisdom teeth, experienced temporary hearing difficulties, and had some residual misalignment of his teeth. Defendants argued that the loss of three teeth, the malocclusion, and hearing problems were not proximately caused by the accident. For purposes of deciding the motion for directed verdict, defendants' argument must be accepted. Nevertheless, the cause of plaintiff's fractured jaw, the treatment required to set it, and the limitations on plaintiff's ability to use his mouth were not disputed. Surgery was required to set the jaw, and plaintiff's mouth was wired together for nearly three months. He could not chew, lost twenty pounds because of the liquid diet, and could talk only through clenched teeth. Viewing the evidence in the light most favorable to defendants, plaintiff clearly suffered an impairment of body function—the ability to use his mouth for eating and speaking.

Nevertheless, the trial court properly denied plaintiff's motion for directed verdict because reasonable minds could differ on whether the impairment was serious. Plaintiff was able to eat, drink, and talk while his mouth was wired. The fracture healed satisfactorily within three to four months. Assuming that plaintiff's malocclusion was caused

---

[60] Unpublished opinion per curiam of the Court of Appeals, decided October 4, 1984 (Docket No. 71705).

by his prior injuries, there was no residual impairment of mouth function. Since the jury's finding that plaintiff had not suffered a serious impairment of body function was not against the great weight of the evidence, it should not be disturbed.

We note that plaintiff's ability to work on his van, go to the beach, and dance at a local bar after the accident was not relevant to the question whether he had sustained a serious impairment of his mouth function. Unlike the "general ability to live a normal life" test, the focus of the threshold inquiry must be on the extent a particular body function was impaired, not on how the impairment affected plaintiff's daily life.

### D. KUCERA v NORTON

On October 24, 1980, defendant struck plaintiff's truck from the rear. Plaintiff was thrown forward by the impact into the steering wheel. In addition, the rear window of the cab popped out and hit plaintiff's head. Plaintiff drove home, but went to a hospital several hours later because of sharp pains in his neck and back. He was x-rayed, given muscle relaxants, and released. Plaintiff rested during the ensuing weekend and returned to work the following Monday.

Plaintiff testified that he repaired pumps, wells, and motors for a well drilling company. This job often entailed lifting pumps weighing 60 to 120 pounds. Since the accident, plaintiff was restricted from lifting objects weighing over thirty to thirty-five pounds. To accommodate this restriction, plaintiff's employer provided helpers to do heavy lifting. Plaintiff acknowledged that he had missed very little work because of his injuries. He maintained that he went to work even when his back hurt. He continued to experience pain in his neck

and between his shoulder blades. He explained how the injury prevented him from pursuing his prior recreational activities (skiing, snowmobiling, and hunting) and curtailed several other activities.

Plaintiff was examined by a chiropractor one month after the accident. He testified that plaintiff complained of chest pain, an inability to breathe deeply, and pain between the shoulder blades. Muscle spasms were observed. X-rays taken on the date of the accident, plaintiff's initial visit (November 18, 1980), and the date of trial (February 28, 1983) revealed a subluxation (i.e., partial dislocation) of the sixth thoracic vertebra and scoliosis. The chiropractor stated that these abnormalities were the result of plaintiff's impact with the steering wheel, which caused the ligaments and muscles holding the vertebrae in place to be stretched and torn. The injuries were such that the ligaments and muscles would not be able to resume their normal function.

Initially, plaintiff received chiropractic treatment every other day for six to eight weeks. Plaintiff was advised to take time off work, not stand on his feet for more than four hours per day, and not lift more than twenty-five pounds. Subsequent treatments were less frequent, although plaintiff was still being treated at least once every two weeks. Plaintiff generally sought help when he had difficulty breathing and experienced spasms in the midthoracic region. This generally occurred whenever plaintiff lifted heavier objects. It was the opinion of plaintiff's chiropractor that plaintiff's lifting restriction would be permanent and that he would need chiropractic treatment for the rest of his life. Ultimately, his condition would degenerate and arthritis would develop.

Defendant's medical expert presented an entirely different story. His examination of plaintiff

on February 11, 1982, uncovered no evidence of spasm, nerve damage, fracture, or disc disease. Plaintiff's range of motion was not limited. This doctor detected an asymmetry of plaintiff's chest which could cause back pain. However, he did not believe that this condition was causally related to the accident. Defendant's expert found no condition which warranted chiropractic treatment.

Defendant's motion for a directed verdict on the threshold issue was taken under advisement. The jury found in plaintiff's favor and awarded $10,000 in damages. Defendant immediately moved for judgment notwithstanding the verdict. Likening plaintiff's injuries to those described in *Hermann v Haney,* the Grand Traverse Circuit Court concluded that plaintiff had not sustained a serious impairment of body function as a matter of law.

The Court of Appeals affirmed the judgment for defendant. It found that the use of the back in lifting is an important body function, but that plaintiff had not sustained a serious impairment. The Court noted that plaintiff had missed very little work, was given a helper, and had not suffered any loss of wages or earning capability. Although plaintiff's social activities had been hindered, the injury was not akin to death or permanent serious disfigurement. The panel questioned whether plaintiff's injuries were objectively manifested, but did not decide the issue because the impairment was not serious. 140 Mich App 156; 363 NW2d 11 (1984).

Unlike the other cases before this Court, a factual dispute existed as to the nature and extent of plaintiff's injuries. This dispute warranted sending the threshold issue to the jury, unless it can be said that defendant was entitled to judgment as a matter of law when the evidence is viewed in the light most favorable to plaintiff. Plaintiff's medical

evidence established that he had suffered a soft
tissue injury to his back, which prevented him
from lifting more than thirty-five pounds or engag-
ing in certain activities. Thus, plaintiff's injury
impaired a body function—the ability to use his
back in lifting.

As to whether the impairment was serious, rea-
sonable minds could differ on the basis of plain-
tiff's evidence. Plaintiff was previously able to lift
at least 120 pounds unassisted. According to plain-
tiff's expert, this seventy-percent impairment of
lifting ability is a permanent condition which will
gradually deteriorate. Chiropractic treatment will
probably be necessary for the rest of plaintiff's life.

Therefore, the circuit court erred in granting
defendant's motion for judgment notwithstanding
the verdict. Since the jury's finding that plaintiff
sustained a serious impairment of body function is
not against the great weight of the evidence, the
verdict for plaintiff must be reinstated.

The Court of Appeals incorrectly focused on
plaintiff's lack of absenteeism and wage loss. The
fact that plaintiff continued to work despite the
pain, and that his employer provided a helper,
does not negate the fact that plaintiff's back func-
tion was significantly impaired. The Court of Ap-
peals reasoning would penalize persons who re-
turned to favored work. The Court should have
focused instead on the extent and permanency of
plaintiff's impairment.

### E. ROUTLEY v DAULT

On June 25, 1980, plaintiff was driving a tractor-
trailer when he struck defendant's car from the
rear. (The parties disputed whose negligence
caused the accident.) Plaintiff was thrown about
the passenger compartment, but maintained his

grip on the steering wheel. As a result, he sustained a bilateral inguinal hernia.

Plaintiff first sought medical help on July 7, 1980. In his deposition, plaintiff's doctor stated that plaintiff's chief complaint was pain in his left groin, which radiated into the left thigh.[61] A small inguinal impulse was discovered and plaintiff was advised not to work. When plaintiff was reexamined one week later, the impulse was more prominent. The doctor concluded that plaintiff had sustained a hernia as a result of the accident.

Surgery was performed on July 24, 1980, to repair the hernia. Plaintiff was hospitalized for five days. Although plaintiff initially obtained some relief, he again experienced pain due to scar tissue surrounding the ilioinguinal nerve. A second operation was performed on April 2, 1981, to remove the scar tissue. Plaintiff was discharged from the hospital five days later.

Plaintiff experienced pain soon after the second operation. His doctor opined that the pain could be caused by scar tissue from the second operation irritating a nerve. However, he did not contemplate performing further surgery. He suggested that plaintiff gradually return to his normal activities, as long as they did not involve lifting more than thirty to forty pounds.

In his deposition, plaintiff stated that he suffered constant pain, which intensified when he performed many physical activities. Operating heavy equipment caused pain in his back, groin, and legs. He could not stand on his feet for eight hours. Lifting a gallon of milk or climbing a flight of

---

[61] Plaintiff also complained of pain in his neck and back. X-rays revealed a minimal compression fracture of the eleventh thoracic vertebra. However, plaintiff's physicians were not certain whether the fracture was related to the accident. The parties did not discuss plaintiff's back problems during the motion for summary judgment.

stairs caused severe pain. He could not perform household chores or pursue his prior recreational activities. The pain also interfered with his ability to engage in sexual relations and to play with his children. Plaintiff believed that he could perform sedentary work, but could not return to his logging job.

The circuit court granted defendant's motion for summary judgment on the threshold issue. Although plaintiff had undergone two operations, the court believed that the Legislature and *Cassidy* Court would not view a hernia as a serious impairment of body function.

The Court of Appeals affirmed in a two-to-one decision. The majority observed that plaintiff's ability to walk and lift was somewhat restricted. However, he was not incapacitated for an extended period of time or prohibited from engaging in his normal daily activities. In fact, plaintiff. was encouraged by his doctor after the. second operation to return to employment which did not involve heavy lifting. The majority declined to consider the fact that plaintiff's logging job involved some heavy lifting. 140 Mich App 190, 195; 363 NW2d 450 (1984).

In his dissent, Judge KELLY argued that summary judgment was improper because reasonable minds could differ as to the seriousness of the impairment when the evidence was viewed in the light most favorable to plaintiff. He noted that plaintiff still suffered chronic pain as a result of the two operations. Although plaintiff's physician encouraged him to return gradually to his normal level of activity, plaintiff had not accomplished this goal. In addition, reasonable minds could differ on whether plaintiff's injury restricted his ability to walk and lift. *Id.,* p 196.

We concur with Judge KELLY's reasoning. It is

undisputed that plaintiff suffered a hernia due to the accident, underwent two operations, and was hospitalized for nearly two weeks. Plaintiff's ability to walk and lift is impaired by the residual effects of the surgery. Thus, plaintiff suffered an injury which impaired body functions.

On the basis of the evidence contained in the depositions of plaintiff and his treating physician, reasonable minds could differ on whether the impairment of body function was serious. Plaintiff cannot lift more than thirty to forty pounds, and has experienced severe pain lifting a gallon of milk. Although plaintiff did not state how much weight he could lift prior to the accident, his prior employment undoubtedly required him to lift more than forty pounds. Plaintiff also experienced severe pain after climbing stairs, standing on his feet for long periods, and engaging in certain activities. Plaintiff's doctor did not foresee the need for further surgery, but he did not state that plaintiff's condition would substantially improve in the near future. The fact that plaintiff underwent, and recuperated from, two operations performed under general anesthesia also weighs in favor of finding a serious impairment. Summary judgment for defendant was therefore inappropriate.

### XIII. CONCLUSION

Without further guidance from the Legislature, we believe that the factfinder is better able to determine whether the plaintiff sustained a serious impairment of body function in those cases where reasonable minds could differ on the answer. In each of the instant cases, the threshold issue should have been submitted to the jury.

In *DiFranco,* the decision of the Court of Appeals is affirmed.

In *Burk,* the decision of the Court of Appeals is affirmed on different grounds.

In *Paupore,* the decision of the Court of Appeals is affirmed.

In *Kucera,* the decision of the Court of Appeals is reversed. The case is remanded to the Grand Traverse Circuit Court for entry of a judgment on the jury's verdict for plaintiff.

In *Routley,* the decision of the Court of Appeals is reversed. The case is remanded to the Muskegon Circuit Court for further proceedings consistent with this opinion.

BRICKLEY, BOYLE, and ARCHER, JJ., concurred with CAVANAGH, J.

WILLIAMS, C.J. (*concurring in part and dissenting in part*). Although I concur in the results reached by the majority in each of these cases, I must respectfully dissent from the analysis. Four years after this Court issued its opinion in *Cassidy v McGovern,* 415 Mich 483; 330 NW2d 22 (1982), the majority sees fit to overrule the decision of five members of a six-member court and adopt the position of the dissent in that case. I cannot accept the premise that such action assists the bench and bar in construing the phrase, "serious impairment of body function" or is conducive to the progress of orderly jurisprudence in this state.

Even in view of the short shrift given to the doctrine of stare decisis, I might be inclined to sign the majority opinion if I were persuaded that it corrected an earlier misinterpretation of the will of the Legislature. I cannot reach that conclusion.

The principal conclusions of the majority, with which I disagree, are as follows:

1) The question whether the plaintiff suffered a

serious impairment of body function must be submitted to the trier of fact whenever the evidence would cause reasonable minds to differ as to the answer. This is true even where there is no material factual dispute as to the nature and extent of the plaintiff's injuries.

\*    \*    \*

4) The impairment need not be . . . of an important body function.

\*    \*    \*

5) The "general ability to live a normal life" test will no longer be used to determine whether the plaintiff suffered a serious impairment of body function. [*Ante,* pp 38-39.]

1

As to the first conclusion, there appears to be no compelling reason to depart from the normal rule that the judge construes the law and the jury decides on the facts. The proposition that "[t]he question whether the plaintiff suffered a serious impairment of body function must be submitted to the trier of fact whenever the evidence would cause reasonable minds to differ as to the answer" even where there is no material dispute of fact sidesteps the very reason for which this Court granted leave to appeal in these cases. These cases were taken in an effort to give the bench and bar further definition of the legislative phrase, "serious impairment of body function." The majority itself recognizes the need for further definition, and states:

By choosing two rather amorphous thresholds, the Legislature apparently preferred that the parameters of § 3135(1) be developed through the judicial process. [*Ante,* p 48.]

Rather than using *Cassidy* as a starting point

for the further development of a working definition of serious impairment of body function, the majority eliminates the aids to construction adopted by the Court in that case, without substituting any similar aids. Henceforth, decisions as to what constitutes a serious impairment of body function will be rendered by juries and no body of law will have been or will be created in the future to aid the bench and bar.

Even if we were to accept the majority's conclusion that the meaning of the phrase shall now be left to the jury, the jury will still have to be instructed in its duty to interpret the phrase. The majority does nothing to guide the trial courts in this respect.

The meaning of the § 3135 language is a matter of statutory construction. It is a well-settled principle of law that statutory construction is a matter for the courts and not for the jury.

2

Second, I agree with the majority's conclusion that the Legislature did not intend to limit recovery of noneconomic damages to the catastrophically injured. The majority's recitation of the legislative history demonstrates that the lawmakers rejected language which would perhaps have raised the threshold so high that only the catastrophically injured could successfully overcome it. The quoted comments of Representatives Clark and Crampton (*ante,* pp 44, 45), however, indicate that those legislators, at least, believed that the threshold, as it was finally drafted, was still a substantial obstacle to suit. In my opinion, *Cassidy* was consistent with this history in limiting recovery to those suffering serious impairment of *important* body functions, and in its holding that Leo

Cassidy, who suffered complete breaks of both bones in his lower leg, wore casts for seven months and was almost completely recovered after one and one-half years, did indeed suffer a "serious impairment of body function" within the meaning of the statute. Therefore, I can see no reason to discard the *Cassidy* rule that "serious impairment of body function" contemplates the impairment of an important body function. In the statutory language, "serious impairment of body function" appears with the other threshold requirements of "permanent serious disfigurement" and "death," leaving the strong implication, under the rule of ejusdem generis, that while the impairment need not be permanent or fatal, it was not to be transient or trivial either.

While perhaps not definitive by itself, the legislators' use of the words, "serious impairment of body function" rather than "serious impairment of *a* body function" helps persuade me of the correctness of the *Cassidy* Court's conclusion that the legislators did not mean serious impairment of *any* body function.[1]

3

As to the "general ability to live a normal life" test, while I do not regard it as exclusively definitive, I do regard it as useful. The question is whether there has been a serious impairment of body function. Medically there are scientific tests to measure this. But there are practical tests that may also be useful. A person's ability to walk, talk, lift, and perform normal daily activities is an important consideration in determining the seri-

---

[1] Therefore, I find it difficult to agree with the majority's statement (*ante,* p 65) that "the relevant inquiries are whether the injury impaired *a* body function and, if so, whether that impairment was serious." (Emphasis added.)

ousness of an injury. While these matters in many cases depend upon the credibility of the plaintiff, judges and juries resolve questions of credibility every day.

GENERAL CONCLUSION

In conclusion, while I agree with the results in each of these cases, I would hold, consistently with *Cassidy,* that where there is no factual dispute regarding the extent of a plaintiff's injuries the court is to decide as a matter of statutory construction whether plaintiff has suffered a serious impairment of body function. Where there is a factual dispute which straddles the line demarcating those injuries which constitute serious impairment of body function, and those which do not, the factual dispute is to be submitted to the jury which should be instructed that, if it finds the facts to be as the plaintiff claims, it must also find a serious impairment of body function.

Therefore, in *DiFranco, Burk,* and *Paupore,* in which juries found no serious impairment, I agree with the results, but hold that the trial courts should have found no serious impairment as a matter of law.

In *Kucera* and *Routley* the factual disputes, in my view, "straddled the line" and therefore presented jury questions. In *Kucera,* the jury resolved the dispute in plaintiff's favor. The trial court, viewing the evidence in the light most favorable to the plaintiff, granted judgment notwithstanding the verdict to defendant. While the trial judge was correct in assuming the duty to determine whether the plaintiff's claimed injuries constituted a serious impairment, I agree that the court's conclusion was in error and the jury's verdict should be reinstated.

In *Routley,* the trial court granted summary judgment for the defendant. In my view, plaintiff's complaint that the accident caused a continuing disability in which lifting a gallon of milk or climbing a flight of stairs resulted in severe pain, if believed by a jury, described a serious impairment of body function. I therefore agree that summary judgment was inappropriate. When the matter is tried, it is my view that the jury should be instructed that, if it finds the facts to be as plaintiff contends, it must find a serious impairment of body function.

Riley, J., concurred with Williams, C.J.

Levin, J. I concur with Chief Justice Williams for the reasons stated in part 1 of his opinion.