## Henning v. Gable

C.P. of Monroe County, no. 3278 Civil 1993.

*James A. Doherty Jr.,* for plaintiff.
*Joseph G. Price* and *Paul T. Oven,* for defendants.

CHESLOCK, *J.,* September 5, 1996—Plaintiff commenced this action on October 21, 1993, by filing a complaint. Defendants filed an answer and new matter on January 3, 1994. On April 22, 1996, defendants filed a motion for summary judgment, a memo in support of that motion, and a praecipe for argument. Plaintiff thereafter filed a cross-motion for summary judgment, reply to defendants' motion for summary judgment, and brief in opposition to defendants' motion for summary judgment on May 6, 1996. Neither party appeared for arguments on June 3, 1996. Therefore, this court entered an order that both the motion for summary judgment and cross-motion for summary judgment be stricken from the argument list. On June 11, 1996, defendants again praeciped the case for argument.

Arguments were heard on August 5, 1996, and we are now ready to dispose of this matter.

The case presently before the court arises out of an accident resulting from the collision of the automobiles of plaintiff and defendants on November 14, 1991. Plaintiff was allegedly injured in the accident and filed a complaint on October 24, 1993 seeking damages for great physical pain and anguish, depreciation in earnings, deprivation of life's pleasures, an interruption in lifestyle, and ongoing medical bills.

Plaintiff had elected a "limited tort option" under the Pennsylvania Motor Vehicle Financial Responsibility Act in his automobile insurance plan. The limited tort option offers the insured a lower premium in ex-

change for a waiver of his right to sue for noneconomic damages unless he has suffered "serious injury." 75 Pa.C.S. §1705(d).

Defendants filed a motion for summary judgment on April 22, 1996, alleging plaintiff has not proven "serious injury" and thus is not entitled to nonmonetary damages. Thereafter on May 6, 1996, plaintiff filed a cross-motion for summary judgment alleging that he has proven "serious injury" and is entitled to nonmonetary damages.

We will begin our analysis of the instant motions with a brief review of the law governing motions for summary judgment. The applicable law is found in Rule 1035(b) of the Pennsylvania Rules of Civil Procedure, which states that summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pa.R.C.P. 1035(b).

Additionally, the Pennsylvania Superior Court has held that in deciding whether or not to grant summary judgment, it is the function of the judge to determine as a matter of law whether a plaintiff who has elected the limited tort option under the Pennsylvania Motor Vehicle Financial Responsibility Law has suffered "serious injury" which would allow him to sue for noneconomic damages, such as pain and suffering. *Dodson v. Elvey*, 445 Pa. Super. 479, 665 A.2d 1223 (1995).

With these rules in mind, we will now address both defendants' motion for summary judgment and plaintiff's cross-motion for summary judgment.

Because in this case, plaintiff has elected the limited tort option, we must determine whether or not he has indeed suffered a serious injury. "Serious injury" has been defined by the Pennsylvania Legislature as "[a] personal injury resulting in death, serious impairment

of bodily function, or serious permanent disfigurement." 75 Pa.C.S. §1702.

In *Dodson,* the Pennsylvania Superior Court further defined "serious injury" saying that:

"The 'serious impairment of body function' threshold contains two inquiries:

"(a) What body function, if any, was impaired because of injuries sustained in a motor vehicle accident?

"(b) Was the impairment of body function serious? The focus of these inquiries is not on the injuries themselves, but on how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent, and permanency of the impairment . . . In determining whether the impairment was serious, several factors should be considered: the extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious." *Id.* at 499, 665 A.2d at 1233-34, citing *DiFranco v. Pickard,* 427 Mich. 32, 39, 398 N.W.2d 896, 901 (1986).

Further, "[a]n impairment involves more than the injury itself. The consequences of the injury must involve a serious impact for an extended period of time on a plaintiff's life. . . . It must interfere substantially with the plaintiff's normal activities and not impose only a mild or slight limitation." *Id.* at 499, 665 A.2d at 1234. (citations omitted)

We now turn to the facts of the case at hand. Plaintiff has visited several doctors since the time of the accident. On February 17, 1993, plaintiff was questioned by defendants regarding the accident, any injuries suffered, and the consequences of those injuries. During said interview, plaintiff stated that he first went to the hospital on the night of the accident and the doctors took x-rays of his neck and back and told him to go home and

rest because they couldn't see anything wrong with him.

He also stated that the doctors told him "to take a break and go back to work after five to seven days." Before the accident plaintiff had been working on a trial basis for two or three weeks for a carpet cleaning business. Plaintiff stated that he was unsure how much the carpet cleaning business had paid him for his services. Plaintiff said that he tried to go back to work, but after a short time he couldn't move because his back was bothering him. Plaintiff remained unemployed until December of 1993, when he opened his own business. Plaintiff also claimed that he had played basketball in the past, but now is only able to "shoot the ball around." He also stated that he used to lift weights, but now he can only lift "lighter weights."

On November 29, 1991, Dr. Charles DePena examined plaintiff and noted that he suffered a "small sub-ligamentous disc herniation," but everything else he checked was either "normal," "unremarkable," or "adequate." Plaintiff then set up an appointment on December 26, 1991 with Dr. James J. Kerrigan, who in turn sent him to a Dr. Kim for physical therapy. Plaintiff claimed that he was in physical therapy with Dr. Kim for more than a year before being told to do stretching exercises on his own.

During the time plaintiff was in physical therapy, on February 13, 1992, Dr. Thomas Snyder examined plaintiff and diagnosed:

"Acute traumatic cervical and lumbosacral sprain strain with right brachial radiculitis and bilateral brachial parasthesis, cervical and lumbar paravertebral spasm, and bilateral neurovascular cryogenic disturbance of the lower extremities bilaterally."

Plaintiff claims to have visited Dr. Snyder until December of 1993, when plaintiff opened his own business. He said he stopped seeing Dr. Snyder at that time because "I really haven't had any time."

On August 31, 1994, Dr. P.S. Holla examined plaintiff and stated that plaintiff had a "normal neurological examination" and that he "did not find any abnormality." Dr. Holla also said that there was no reason for plaintiff to visit a chiropractor or physical therapist.

On January 4, 1996, plaintiff was again examined by Dr. James J. Kerrigan, who found that plaintiff had full range of motion in his neck, was able to pass the straight-leg raising test, was able to flex and touch to the ankles, had no focal weakness in the upper or lower extremities, had normal bulk and tone, had normal finger to nose coordination, and was able to walk and heel walk without difficulty. Dr. Kerrigan also said that the disc herniation was "stable" and that plaintiff's symptoms with regard to his left brachial plexopath have "improved considerably."

The only problems mentioned in Dr. Kerrigan's report were subjective claims of stiffness and discomfort by plaintiff. According to Dr. Kerrigan's report, plaintiff stated that he has lower back pain which is aggravated by bending or lifting, "on rare occasions, he will note a brief pain radiating into the right hip and proximal right lower extremity, but this is very fleeting in nature," he "occasionally has a little bit of neck stiffness, but this is more of an annoyance than a disability," he "occasionally notes some knee pain," and if he crosses his legs or lays down with his arms above his head for any length of time, he feels a "tingling" sensation. Dr. Kerrigan also noted that plaintiff would treat any pain or stiffness he felt with Advil.

Upon reviewing all of the above evidence, we find that there is no genuine issue of material fact. Below, we address the factors set forth in *Dodson,* which lead us to such finding. First, with regard to the particular body function impairments sustained, plaintiff claims impairment of his back, neck, and knee.

Second, regarding type and length of treatment, plaintiff was advised to see Dr. Kim, a physical therapist. Plaintiff's treatment with Dr. Kim lasted for approximately one year, at the end of which the doctor told plaintiff he no longer needed physical therapy, but could perform stretching exercises at home.

Finally, with regard to the extent of impairment, plaintiff claims to have difficulty bending and lifting because of soreness in his lower back and his knee, which he treats with stretching exercises and Advil. He also claims to occasionally have a stiff neck, which "is more of an annoyance than a disability." Plaintiff stated that these impairments prevented him from working shortly after the accident. However, there is no evidence that plaintiff was unable to work or that he sought out other employment between the time he started therapy until he opened his own business in December of 1993. Based on the following facts: (1) no doctor stated in his report that plaintiff was unable to work, in fact the emergency room doctors who x-rayed plaintiff told him to go back to work in five to seven days; (2) sometime in 1992 Dr. Kim told plaintiff that he no longer needed physical therapy, but could exercise at home; (3) plaintiff has had no problem working since he opened his own business; and (4) both physicians who examined plaintiff in 1994 and 1996, respectively, said that there was nothing wrong with him, we have no doubt that plaintiff could have found some type of employment during this time. Plaintiff further claims that he is now unable

488

to play basketball, but can only "shoot the ball around" and that he cannot lift as heavy weights as he was once able to. Thus, plaintiff claims that he has suffered a deprivation of life's pleasures and an interruption in lifestyle. We, however, find that plaintiff suffered no serious impact on his life for an extended period of time. Plaintiff's injuries did not interfere substantially with his normal activities, rather they imposed only a mild or slight limitation. Therefore, we find as a matter of law that plaintiff's injuries do not rise to the level of "serious impairment of a bodily function."

Because plaintiff did not sustain a serious injury, he is precluded from recovering for noneconomic damages, including great physical pain and anguish. Further, we find the remainder of the allegations in the complaint to be without merit.

Accordingly, we enter the following order:

## ORDER

And now, September 5, 1996, defendants' motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.