## Piwonski v. Choe

C.P. of Bucks County, no. 93-6263.

*Philip J. Cohen,* for plaintiffs.
*Randolph A. Scott,* for defendant.

GARB, *J.,* January 13, 1999—Plaintiffs sue for damages allegedly incurred as the result of a motor vehicle accident. Defendant has moved for partial summary judgment based upon the limited tort option of the Motor Vehicle Financial Responsibility Law.[1] We determine

---

1. 75 Pa.C.S. §1701.

that partial summary judgment should be granted for the defendant.

Section 7501(a)(1) of the Act provides essentially that each insurer shall notify each named insured of the latter's right to choose the limited or full tort option with the understanding that a premium benefit is derived from the limited tort option. That section further provides for a mandatory notice to named insured which must state that "under the limited tort" option, the insured may seek recovery for all medical and out-of-pocket expenses, but not for pain and suffering or other nonmonetary damages unless the injuries suffered fall within the definition of "serious injury." Section 1705(d) provides that each person who elects the limited tort alternative remains eligible to seek compensation for economic loss sustained in a motor vehicle accident as the consequence of the fault of another person pursuant to applicable tort law. "Unless the injury sustained is a *serious injury*, each person who is bound by the limited tort election shall be precluded from maintaining an action for any noneconomic loss, . . . ." (emphasis added)

In view of the fact that the plaintiffs have admittedly chosen the limited tort option, the question for disposition is whether, on this record, Joseph Piwonski has demonstrated that he suffered "serious injury" in the context of a summary judgment analysis.

*Dodson v. Elvey,* 445 Pa. Super. 479,.665 A.2d 1223 (1995), *allocatur granted,* 544 Pa. 608, 674 A.2d 1072 (1996) held, inter alia, that the resolution of whether a limited tort plaintiff has sustained "serious injury" is one for the court to be made in advance of trial, not an issue for the jury, and may be determined where there is an adequate record by summary judgment. Re-

gardless of whether *Dodson v. Elvey, supra,* can be construed to have decided that the issue of "serious injury" is always one of law for the court, pretrial, that issue has now been set to rest by our Supreme Court in *Washington v. Baxter,* 719 A.2d 733 (Pa. 1998) which held that the issue of determination of "serious injury" may be determined by summary judgment upon the application of summary judgment principles. That court held that the traditional summary judgment standard is to be followed and that the threshold determination was not to be made routinely by a trial court judge, but rather, must be left to a jury "unless reasonable minds could not differ on the issue of whether a serious injury had been sustained." *Washington v. Baxter,* 719 A.2d at 740. Therefore, in the context of summary judgment, the court must determine initially (1) whether the plaintiff as moving party has established that he or she has suffered serious impairment of a bodily function; (2) whether the defense as moving party has established that he or she has not suffered serious impairment of a bodily function; or (3) whether there remains a genuine issue of material fact for the jury to decide. *Curran v. Children's Service Center of Wyoming County Inc.,* 396 Pa. Super. 29, 578 A.2d 8 (1990), *allocatur denied,* 526 Pa. 648, 585 A.2d 468 (1991). As stated more succinctly in *Washington v. Baxter, supra* at 740, whether "reasonable minds could not differ on the issue of whether a serious injury had been sustained."

In addressing the question of whether there is a serious impairment of body function, the court in *Dodson* adopted the standard established in Michigan in virtually identical language and as explicated in *DiFranco v. Pickard,* 427 Mich. 32, 398 N.W.2d 896 (1986). In

this regard, in footnote 11, the Supreme Court in *Washington v. Baxter* affirms *Dodson* and restates the *DiFranco* standard. The court in *DiFranco v. Pickard* provided as follows:

"The 'serious impairment of body function' threshold contains two inquiries:

"(a) what body function, if any, was impaired because of injuries sustained in a motor vehicle accident?

"(b) was the impairment of body function serious?

"The focus on these injuries is not on the injuries themselves, but on how the injuries affected a particular body function. Generally, medical testimony will be needed to establish the existence, extent and permanency of impairment . . . In determining whether the impairment was serious, several factors must be considered: the extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. An impairment need not be permanent to be serious." 427 Mich. at 39, 398 N.W.2d at 901.

"An impairment involves more than the injury itself. The consequences of the injury must involve a serious impact for an extended period of time on a plaintiff's life." *Dodson v. Elvey, supra* at 499, 665 A.2d at 1234, citing *Oswin v. Shaw,* 129 N.J. 290, 318, 609 A.2d 415, 429 (1992). "It must interfere substantially with the plaintiff's normal activities and not impose only a mild or slight limitation." *Dodson v. Elvey, supra,* citing *Licari v. Elliott,* 57 N.Y.2d 230, 236, 455 N.Y.S.2d 570, 573-74, 441 N.E.2d 1088, 1091 (1982). See also, *McClung v. Breneman,* 700 A.2d 495 (Pa. Super. 1997) and *Leonelli v. McMullen,* 700 A.2d 525 (Pa. Super. 1997) which, once again, adopted the factors to be

considered by our courts as set forth in *DiFranco v. Pickard.*

Husband plaintiff was injured when he was driving his motor vehicle on February 28, 1993 when it was struck on the right passenger side by a vehicle driven by the defendant. He was treated in the emergency room of Delaware Valley Medical Center complaining of neck, back, right hip and bilateral knee pain. Although x-rays for fracture were negative, the x-ray of his left knee did show metallic staples at the proximal tibia at the site of an old osteotomy. The x-ray also showed mild degenerative changes. No treatment was rendered, and plaintiff was released.

Plaintiff sought treatment with Dr. Joseph Cammarata, a chiropractor. His complaints on his first visit on March 3, 1993 were neck pain and left knee pain. Physical therapy was initiated for these complaints, and the plaintiff was referred by Dr. Cammarata to Steven Meseri M.D. for an evaluation on March 8, 1993. Dr. Meseri's diagnosis was of cervical strain and sprain, trapezius myofascitis, post-traumatic cephalgia, contusion to third finger of left hand, contusion of left knee.

Dr. Cammarata made a series of observations when he undertook treatment of the plaintiff. On March 3, 1993, with respect to personal care, it was noted that the plaintiff needs some help, but manages most of his personal care. Pain prevented all sex, and the plaintiff was able to sleep less than six hours even when taking tablets. Plaintiff was unable to sit for more than 60 minutes because of pain and was unable to lift or carry anything at all. Pain prevented him from walking more than a short distance and prevented him from standing more than 10 minutes. Pain restricted his social life to his home and his travelling except to the doctor or hospital.

On September 15, 1993, he noted that while the pain is bad, the plaintiff was able to manage without taking painkillers. As for personal care, the plaintiff was able to look after himself normally without causing any extra pain, and his sex life was normal, causing no extra pain. Pain did not prevent the plaintiff from sleeping well, but it did prevent him from sitting for more than 60 minutes. Pain prevented the plaintiff from lifting heavy weights, but he can manage light to medium weights if they are conveniently positioned. Pain prevented the plaintiff from walking more than one quarter of a mile and prevented him from standing for more than 30 minutes. Pain had no significant effect on the plaintiff's social life apart from limiting his more energetic interests (dancing, etc.) and he could travel anywhere, although it gives him extra pain.

Plaintiff sought treatment with James Taitsman M.D., who had previously treated him for an infected prepatellar bursa of the right knee in July of 1984 and chronic low back pain due to discrepancy in the length of plaintiff's legs as well as degenerative disc disease. Dr. Taitsman's first examination was on March 17, 1993 and notes that the plaintiff had a prior history of epiphysiodesis with pins or staples in his left knee. Dr. Taitsman's diagnosis of plaintiff's left knee complaints on this date was of resolving synovitis and a strain of the medial collateral ligament, probably second degree. He prescribed a knee immobilizer, quadricep setting exercises and oral anti-inflammatories. It was his opinion that the plaintiff was unable to work at that time because the plaintiff's work involved walking up and down two flights of stairs all day. The plaintiff was a special education teacher in Trenton, New Jersey. On May 14, 1993, Dr. Taitsman found that the plaintiff

was improving, with some stiffness and some medial joint tenderness lacking some flexion compared to his right knee, and walked with a slight limp on initiation of ambulation. The treatment was to continue physical therapy and anti-inflammatory medication and return to work on May 10, 1993.

On June 29, 1993, in his examination, Dr. Taitsman found the plaintiff doing well, without pain, and exercising on his own. He directed that the plaintiff continue home exercises and return if symptoms worsen. As the result of aggravation and pain, on August 10, 1993, plaintiff returned to Dr. Taitsman who noted that plaintiff may either have a patella problem or degenerative tear of his medial meniscus. An MRI was ordered, which revealed a posterior horn tear of the medial meniscus. Dr. Taitsman recommended arthoscopic surgery and agreed with the plaintiff's request to delay that until Christmas so as not to interrupt his teaching schedule.

Plaintiff underwent left knee arthoscopic evaluation on February 9, 1994, and it was determined that he had a posterior horn tear of the meniscus and chondromalacia of the medial femoral condyle which was debrided. Thereafter, plaintiff began upon the physical therapy program prescribed by Dr. Taitsman, which was completed in April of 1994. Plaintiff returned to work on April 4, 1994. No further treatment was performed by Dr. Taitsman.

During litigation, plaintiff was evaluated at the insistence of his attorney by Michael S. Granis M.D. Dr. Granis noted the plaintiff's left knee injuries and opined that they were related to the accident and that the plaintiff had a 30-degree loss of flexion of his left

knee and an ongoing aggravation of a previously asymptomatic degenerative disease of the left knee.

Plaintiff's deposition was taken with respect to damages on October 31, 1995. At that time, he testified that his worst injury was to his left knee, but that he also injured his neck and his middle finger. He testified that he had body aches and headaches for a month or so after the accident. He testified about the surgery performed by Dr. Taitsman on his left knee. He stated that he saw the doctor a week or so after the surgery and had fluid drained from the knee which was a very unpleasant experience. He then saw the doctor every week for a couple of weeks until the stitches were removed. That was the extent of Dr. Taitsman's treatment. During that period of time, he was doing physical therapy under the prescription of Dr. Taitsman. He testified that he was discharged by Dr. Taitsman approximately two months after the surgery and that he had no pain in his knee when discharged. He testified that the knee bothers him if he walks on it for a long period of time and at night. He testified that he cannot cross his right leg onto his left leg or put his feet up on the couch because it causes pain. He testified that he sometimes had pain sleeping on that knee and had to get a special pillow to cushion it while in bed. As of the time of the deposition, he had no further treatment respecting the knee. With respect to his neck, he testified that he wore a collar for a couple of months and that his neck no longer bothered him. With respect to his middle finger, he no longer experienced any discomfort or restricted use as of the time of the deposition. As of the time of the deposition, he had returned to work.

Based upon the foregoing, and the totality of the record in this case, we are satisfied that there is no issue regarding "serious impairment of body function"

for a jury to decide because reasonable minds could not differ on the issue of whether a "serious injury" had been sustained. It was not. *Washington v. Baxter, supra.* On that basis, there is no issue of material fact to be decided on this case, *Curran v. Children's Service Center of Wyoming County Inc., supra,* and, therefore, partial summary judgment must be granted for the defendant.

## ORDER

And now, to wit, January 13, 1999, it is hereby ordered that summary judgment is entered for the defendant and against the plaintiffs for all claims of noneconomic loss.