## Coughlin v. Miljack Inc.

C.P. of Erie County, no. 14402-1998.

*Mark O. Prenatt,* for plaintiff Coughlin.
*Tibor R. Solymosi,* for plaintiff White.
*James R. Bruno,* for plaintiff Schack.
*Gregory P. Zimmerman,* for defendant Miljack Inc.
*Lisa Lynn Smith,* for defendants Virges and Hains.

BOZZA, *J.,* March 3, 2000—Once again, the court is being asked to determine as a matter of law whether a plaintiff has failed to prove the occurrence of a serious injury and is therefore precluded from recovering damages for noneconomic loss pursuant to the Motor Vehicle Financial Responsibility Law. 75 Pa.C.S. §1701 et seq. In each of the three cases before the court, the plaintiffs were injured in motor vehicle accidents and subject to "limited tort" insurance policies. Each filed an action against a driver claiming "a serious impairment of body function." 75 Pa.C.S. §1702.

The Supreme Court has very explicitly determined that the question of whether a serious injury has been sustained is not a predicate responsibility of the trial court, but an issue to be decided within the context of traditional standards applicable to summary judgment. *Washington v. Baxter,* 553 Pa. 434, 719 A.2d 733 (1998). A summary judgment analysis requires that the court first determine if there are any material issues of fact in dispute, and then view the uncontested facts in a light most favorable to the non-moving party. If reasonable minds could not differ as to the meaning of those facts in light of the applicable law, summary judgment should be granted. *Id.* In *Washington,* the court also noted that with regard to the issue of serious injury "the ultimate determination should be made by the jury in all but the clearest of cases." *Id.* at 441, 719 A.2d at 740.

In *Washington,* the court adopted the view of the Supreme Court of Michigan in *DiFranco v. Pickard,* 427 Mich. 32, 398 N.W.2d 896 (1986), and stated that in order to determine whether a serious injury[1] has occurred, the trier of fact must decide the following:

---

1. The plaintiffs do not claim that they have suffered "permanent serious disfigurement" or death.

(1) Did the plaintiff suffer an injury that impaired a body function?

(2) If a function of the body had been impaired, was that impairment serious? *Id.*

In order to determine whether an impairment is serious, the following criteria, as well as other relevant considerations, should be considered:

(1) The extent of the impairment;

(2) The length of time the impairment lasted; and

(3) The kind and extent of treatment required to correct the impairment.

There is no requirement that the injury be permanent. *Id.* The MVFRL does not provide a definition of "serious" nor indicate any criteria to be used to determine the existence of a serious impairment of body function.

Notwithstanding the now more precisely delineated legal framework for analyzing the existence of a serious injury, the subjective nature of the term "serious" continues to make the resolution of the issue in a summary judgment or any other context very difficult. Indeed, ascertaining seriousness requires at least to some degree a relative inquiry which must take into consideration a myriad of individual circumstances and personal characteristics. Accordingly, it is not surprising that the Supreme Court of Michigan rejected the utilization of a singular conceptual analysis or standard in addressing the issue. *DiFranco v. Pickard,* 427 Mich. 32, 398 N.W.2d 896 (1986). In *DiFranco,* which the Pennsylvania Supreme Court looked to for guidance in defining "serious impairment of body function," the court even rejected the notion that in order for there to be a serious bodily injury, an *important* body function must be impaired. *Id.* at 61. The court also declined to rely on the "general ability to live a normal life" test, and refused to adopt

the idea that serious injury had to be one that was "objectively manifested." *Id.* at 66, 75.

In *Washington,* the plaintiff suffered a cervical sprain, foot sprain, and cuts and contusions. As a result he was treated in the ER and received a cortisone injection in his foot. The injury had no effect on his ability to work, although he could no longer push a lawnmower. He continued to have ongoing pain once per week, and periodically he reported that his ankle would swell. The Supreme Court applied a *DiFranco* analysis and concluded that the impairment of body function was not serious.

Recently, the Superior Court has provided some additional guidance in the analysis of factual settings suggestive of serious injury. In *Hellings v. Bowman,* 744 A.2d 274 (Pa. Super. 1999), the Superior Court decided that reasonable minds could differ as to whether the plaintiff sustained a serious impairment of body function when he incurred a herniated disc with lumbar radiculopathy. The injury resulted in numbness in the right knee, hip pain, muscle spasms in the back, hand cramping and frequent headaches. The plaintiff underwent physical therapy, chiropractic care, and took muscle relaxers and other medications. The functional consequences of the injury included his inability to ride in his wife's car and drive his snowmobile, no work for six weeks, no skiing, limitations on his ability to hunt and horseback ride and to physically interact with his children. The duration of his impairment was not clear. His medical condition was diagnosed by a neurosurgeon.

The plaintiff in *Kelly v. Ziolko,* 734 A.2d 893 (Pa. Super. 1999) also suffered a herniated disc with involvement of nerves affecting his face and toes. Treatment included physical therapy and exercise, chiropractic care

and pain medications, but no surgery. As a result of his injury, Kelly could no longer run or ride his bike, could do limited walking, and couldn't play with his child. However, he had no work limitations. While the duration of the impairment is not explicitly set forth, it appears that part of the functional consequences will be permanent. He endured pain for a period of at least two years following the accident. There was medical confirmation of his limitations, and an indication that his condition may worsen. In these circumstances, the court concluded that reasonable minds could differ as to whether Mr. Kelly had sustained a serious impairment of his back.

In *Furman v. Shapiro,* 721 A.2d 1125 (Pa. Super. 1998), Furman had a back/neck injury described as a "bulging disc." He underwent physical therapy and did home exercises and apparently was prescribed medication. He was required to reduce work to part-time, could walk no more than one block, and could do no heavy lifting. His impairment continued to exist as of three years following the date of the accident. The doctor described the condition as permanent. The Superior Court, finding that reasonable minds could differ as to the existence of serious injury, reversed the trial court's grant of summary judgment.

Additional examples of instances where plaintiffs alleged serious injury are found in *DiFranco.* In each of the following cases, the court found that reasonable minds could differ as to the existence of a serious injury:

(1) The plaintiff sustained a soft tissue injury to his back, limiting his ability to move his lower back by 40 to 50 percent and his neck by 30 to 40 percent. As of the time of trial, the limitation had been reduced to 5 to 15

percent. He returned to work with no limitations after two months. His treatment included traction and physical therapy. There was some permanent impairment and his ability to move his lower back will be increasingly limited as his arthritis progresses. On these facts, the Supreme Court decided that the trial court was correct in denying defendant's motion for a directed verdict and stated, "We cannot say that all persons would conclude that plaintiff's impairment was not serious." *Id.* at 78.

(2) A person injured while riding his motorcycle suffered a fracture to his right clavicle. He wore a brace-type cast for four to six weeks and the fracture healed without any problem. During a period of four to six weeks, the movement of his arm and shoulder were totally impaired. The plaintiff continued to experience some pain in his shoulder following the removal of the cast and it is likely to continue for several months.

(3) Plaintiff sustained a severe fracture of his jaw and was required to have his mouth wired as a result of surgery to correct the fracture. He was restricted to a liquid diet for a period of time and could not chew. The wires in his jaw remained for a period of approximately two months. There were some complications including the temporary loss of 30 percent of his hearing, a loss of weight, and pain in his mouth, ears and back. The fracture healed satisfactorily within three to four months and there was no ongoing impairment to the functioning of his mouth. In this case, the jury found that the plaintiff did not suffer a serious impairment of body function and the court decided that the verdict was not against the weight of the evidence. [In an interesting caveat, the court commented that "the focus of the threshold inquiry must be on the extent the particular body function was im-

paired, not on how the impairment affected plaintiff's daily life." *Id.* at 85.]

(4) As a result of being rear-ended, the plaintiff suffered a dislocation of a thoracic vertebrae and scoliosis. This diagnosis was supported by the opinion of a chiropractor. He underwent chiropractic care for six to eight weeks, and was advised not to stand on his feet for more than four hours per day, nor lift more than 25 pounds. He continued to receive treatment thereafter from the chiropractor once every two weeks. The chiropractor believed that the lifting restrictions were permanent and that he would need chiropractic care for the rest of his life and that ultimately the condition would degenerate because of arthritis. Following a trial, the jury found that the plaintiff had sustained a serious impairment of body function. The court agreed that the record supported the jury's conclusion, reversed the court of appeals, and noted that it was incorrect to focus on the plaintiff's lack of absenteeism and wage loss, stating, "The court of appeals' reasoning would penalize persons who return to favored work. The court should have focused instead on the extent and permanency of the plaintiff s impairment." *Id.* at 88.

(5) As the result of an accident, a tractor-trailer driver suffered a hernia and underwent two operations with hospitalizations for two weeks. The plaintiff cannot lift more than 30 to 40 pounds and experiences severe pain climbing stairs, standing for long periods, and when lifting a gallon of milk. There was no indication as to whether plaintiff's condition would improve in the future. The court noted the fact that the plaintiff underwent two surgeries performed under general anesthesia and said that "weighs in favor of finding a serious impairment." *Id.* at 91.

It is apparent that there are a myriad of circumstances which will beg the question of serious injury. The traditional summary judgment analysis required by *Washington* limits the granting of summary judgment to the clearest of cases. 553 Pa. at 441, 719 A.2d at 737. As is evidenced by the examples described above, each case presents a unique interplay of factual circumstances. It is also apparent that the focus must remain on the nature of the impairment of the body function, its extent and permanency, and the treatment required in an attempt to remedy it. As this court noted in *Johnson v. Gutfreund,* Erie County no. 11289-1997 (1999), the assessment of seriousness requires an inherently subjective analysis and while the legislature intended that one who selects the limited tort option should recover for noneconomic damages in only narrow circumstances, it is a matter that should routinely be left to the jury. In the *Johnson* case, the plaintiff had broken her ankle and the extent of her treatment included wearing a cast for six weeks and using a cane for a couple of additional weeks. She had no medically documented limitations on the use of her ankle and maintained that her only difficulty was in climbing stairs, picking up her daughter, doing heavy cleaning, and roller skating. Three years after the accident she had only intermittent pain and some walking limitations, no other impairment on the use of her ankle, and she described her current state of health as "aches and pains." As the plaintiff in *Washington,* Ms. Johnson missed only limited work, her treatment was not extensive, and the injury had no impact on her ability to perform her job, and only minor impact on her ability to carry out personal activities. This is not to say that a fracture to an ankle may not result in serious impairment of a body

function. It is to say that in Ms. Johnson's case, it did not. The court must now address the diverse and distinct circumstances presented by the three cases before it:

## A. *COUGHLIN v. MILJACK*—NO. 14402-1998

As a result of an automobile accident in December of 1996, Debbie Coughlin suffered a herniated disc and a bulging disc in her spine. In addition to the pain associated with those obvious injuries, she suffered from migraine headaches. For a period of approximately one year following the accident she underwent chiropractic care, physical therapy, utilized various pain medications, and was significantly limited in her ability to carry out her daily activities because of serious pain.

In January 1998, she underwent spinal surgery to fuse vertebrae in her spine, and for six months following the surgery, she was largely incapacitated from carrying on her ordinary activities. As of June 1999, the date of her deposition, she was considerably improved, but continued to have problems with arm discomfort and she required some assistance with getting dressed. She couldn't lift heavy objects or stand for long periods of time. The existence and extent of her injury are well-documented by medical records.

Utilizing the *DiFranco* analysis adopted in *Washington* yields the following results:

(a) The functioning of Ms. Coughlin's back was impaired.

(b) The extent of impairment included the inability to utilize her back to carry out a number of day-to-day activities for an extended period of time.

(c) The length of time associated with the primary period of impairment was 18 months.

(d) Her treatment included a variety of modalities, including spinal surgery and an accompanying six-month period of rehabilitation.

(e) The nature and extent of her injuries are well-documented by medical records.

It is obvious based on the summary judgment record that a jury could reasonably find that Ms. Coughlin suffered a serious injury.

### B. *WHITE v. HAIN*—NO. 13485-1997

As a result of being struck by a car as he was crossing the street in October of 1995, Aaron White sustained an injury to his anterior cruciate ligament in the area of his knee. He also suffered a fracture of the pubic bone, and various contusions and abrasions. At the time of the accident he was a high school student and employed part-time as a busboy and dishwasher. While the pubic bone injury caused him virtually no difficulty, the knee injury required two surgical procedures: an arthroscopic surgery in January 1996, and a more conventional invasive procedure in September of 1997, which resulted in the reconstruction of his ACL. He underwent two different courses of physical therapy, took pain medication, wore a brace and used crutches. He was unable to work at various part-time jobs for a total period of approximately six months, missed school for a number of weeks, and during the intervening year-long period between surgeries, utilizing his knee in a normal fashion was restricted. The knee felt like "straw" when he would bend it and, on occasion, he would collapse to the ground in pain. In general, he suffered continuous discomfort for a period of at least a year.

Following surgery, in addition to going to physical therapy three times per week, he was required to keep

his leg totally straight in a brace for two and one-half months, used crutches for one month, and overall, used some form of brace for three to four months. As of the time of his deposition in February of 1999, which was approximately three years post-accident, the knee had improved but he continued to have occasional pain, and he could no longer run or play basketball.

Utilizing the *DiFranco* criteria yields the following results:

(a) The functioning of Mr. White's knee was impaired.

(b) The extent of impairment included limitations in the general use of his leg for normal activities because of associated pain and weakness. This resulted in the loss of work, the missing of school, the inability to participate in athletic activities, and varying periods of limited mobility.

(c) The primary period of impairment encompassed the period within which two surgeries were performed, and lasted about two and one-half years.

(d) The treatment included arthroscopic surgery, ACL reconstruction surgery, physical therapy and pain medication.

(e) The existence and extent of his injuries are well-documented by medical evidence.

When all the evidence is viewed in a light most favorable to Mr. White, reasonable minds could differ as to whether the impairment of his knee was serious.

## C. *SCHACK v. VIRGES*—NO. 15431-1995

As the result of an automobile accident in December 1993, Donna Schack was seen briefly in the hospital emergency room and released to the care of her private physicians. She suffered a concussion, cervical strain and

lacerations. Over a period of four years, she was treated with chiropractic care, osteopathic manipulation, physical therapy, and trigger point injections, as well as pain medication. Her continuing problems included daily neck pain and headaches, and periodic migraine headaches. Following the accident, she was off work for a little bit less than a month before going back to work as an accounting assistant part-time. She regained full employment after about three months. Her injuries did not interfere with her ability to carry out any portion of her job. As of the time of the deposition, she was unable to ride her bike, and her injuries had limited her ability to bowl. She has no other functional limitations. She was involved in a second car accident in March of 1995, and as a result of that accident, her neck injury was further aggravated for a period of time. There is no loss of range of motion in her neck, and the diagnostic studies failed to definitively disclose the physiological nature of her neck injury.

The first question is whether Ms. Schack suffered an impairment of a function of her body. In that regard, it would appear that she has had some difficulty moving her neck. Although the record does not explicitly address this matter, the treatment that she received was considerable and it appears to have been directed to improve her ability to use her neck in a less painful manner. From a functional point of view, her injury has had very limited impact. The only activity that she reports completely curtailing is bike riding. Her participation in bowling continued until the second accident, and thereafter, she indicated she was forced to quit. A close review of her medical records does not yield any medical opinion concerning continuing physical limitations as of

the date of her deposition in 1997. Although her treatment continues, she cannot distinguish which portion of the treatment is necessary because of her original injury, and which portion is needed because of injuries suffered in the March 1995 accident.

Applying a *DiFranco* analysis yields the following results:

(a) The ability of Ms. Schack to move her neck was impaired.

(b) The extent of impairment included limitations on using her neck for work purposes, bike riding and bowling.

(c) The primary period of impairment coincided with her work loss and lasted three months.

(d) Treatment included physical therapy and injections, chiropractic and osteopathic manipulation and pain medication, but not surgery or prolonged immobilization.

(e) The extent of treatment is documented by medical records, but the extent of impairment of the use of her neck or its permanency are not supported by medical testimony.

Considering the nature, extent and permanency of her injury, the court concludes that reasonable minds could not differ that Ms. Schack did not suffer a serious impairment of the use of her neck.

Based on the conclusions set forth above, appropriate orders shall follow.

## ORDER

And now, March 3, 2000, upon consideration of defendant's motion for summary judgment and argument thereon, and for the reasons set forth in the attached opinion, it is hereby ordered, adjudged and decreed that the motion for summary judgment is denied.

518

## ORDER

And now, March 3, 2000, upon consideration of defendant's motion for summary judgment and argument thereon, and for the reasons set forth in the attached opinion, it is hereby ordered, adjudged and decreed that the motion for summary judgment is denied.

## ORDER

And now, March 3, 2000, upon consideration of defendant's motion for summary judgment and argument thereon, and for the reasons set forth in the attached opinion, it is hereby ordered, adjudged and decreed that the motion for summary judgment is granted.